## AMANDA L. BARNETT *vs.* LAURA D. DICKINSON AND THE SAFE DEPOSIT AND TRUST COMPANY.

*Devise of a House Upon Condition of Residence Therein by the Devisee — What Constitutes Abandonment of Residence.*

Testator devised a house to a corporation as trustee, directing that it should permit the house and effects therein to be occupied "by my Aunt Matilda and my Cousins Maria W. and Laura D., so long as they shall remain unmarried and shall choose to reside in the said house, and if any one or more of them shall marry or shall abandon the said house and cease to reside therein, then the said house, etc., shall be for the use and occupancy of her or them who shall remain unmarried and shall choose and continue to use the said house as a residence." The trustee was also directed to pay $3,000 annually to said beneficiaries, "but when any one or more of them shall marry or shall abandon the said house and shall cease to reside therein, then * * the said sum is to be paid to the survivor or survivors of them or her who shall remain unmarried and who shall continue to reside in the said house. It being my purpose and object to provide a suitable home and maintenance for my said aunt and cousins during their lives and the life of the longest liver, if they choose to reside in the said house and remain unmarried. And after the death of my said aunt and my said cousins, or after they shall all marry or shall abandon the said house and cease to reside in it, whichever of these events shall first happen, then I give, &c., the said house and the sum of $50,000 to my sister, Amanda L. B." The trust was administered in the Court below and the appellant, Amanda L. B., filed a petition in the case alleging the death of testator's aunt, the marriage of Maria W. and that Laura D. had abandoned the said house and ceased to reside therein, aud asking that the trustee be directed to convey the house to the petitioner and pay her the above mentioned sum of money. The evidence showed that Laura D. was temporarily absent from the house, at different periods, for several months at a time, on some occasions at a sanatarium according to the advice of her physician, but that her personal effects remained in the house; that it was always kept open and occupied by her servants, and that she did not have the mental determination to abandon the same as a place of residence. *Held,* that she had not abandoned residence in the house within the meaning of the will, nor forfeited her rights therein.

Appeal from an order of the Circuit Court of Baltimore City (WICKES, J.), dismissing the petition filed in the case.

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, SCHMUCKER and JONES, JJ.

*J. J. Alexander* and *Frank Gosnell* (with whom was *Thos. M. Lanahan* on the brief), for the appellant.

From the evidence it appears that in the year 1891, the year of the testator's death, the Misses Dickinson went away for the summer months, and the house remained closed till February, 1892. In 1892 it was closed for June, July and August, and so in 1893 the house was closed during those months. In the winter of 1893-94 the house was open, and so of the winter of 1894-95. Mrs. Aiken was married in March, 1895, and for the remainder of that year up to December, 1895, the house was closed, but was opened until May, 1896. From May, 1896, until December, 1896, it was closed. Then it was open from December, 1896, to February, 1897; and from February, 1897, to October, 1898, the house was closed. To be sure it is contended that the house was ready for occupation at any time, but during the times above specified the appellee did not reside in it, so that from May, 1891, to October, 1898, a period of say ninety months, the house has been closed and unoccupied about fifty-three months. But in 1896, it was closed something over eight months, from April to December, 1896. It was then open until February, 1897, and from February, 1897, to October, 1898, a period of twenty months, it was closed. The excuse is made of illness. But no witness as to this is called for the defense except Mrs. Aiken, and the employees of the trustee.

Under the will a mere right of enjoying the possession, a mere usufruct of the house and right of occupancy, a personal privilege which she might waive, but could not assign, passed to the appellee under the will, and the payment of the annuity depended upon this occupancy of the premises by her. The condition is to give her an interest if she resides—not to give her an interest and take it away if she does not reside. *Warfield* v. *Gambrill;* 1 G. & J. 503; *Addison* v. *Bowie*, 2 Bland. 627; *Re. Archer's Estate,* 23 N. Y. Suppl. 1041; *Bu-*

*chanan* v. *Dunn,* 40 Penna. St. 82; *Gardner* v. *Wagner,* Baldwin C. C. Rep. 454; *Porter* v. *Green,* 1 Cold. (Tenn.) 564; *Maeck* v. *Nason,* 21 Verm. 115; *Endicott* v. *Endicott,* 41 N. J. Eq. 93; *Kingman* v. *Kingman,* 121 Mass. 249; *Partridge* v. *Partridge,* (1894.) 1 Ch. 355.

Then what did the testator mean by residence? He speaks of the house as the house in which he resides, which shows she was to reside in the house in the same way in which he was doing the same thing. He uses the word "reside" ten times and the word "residence" twelve times, and twice declares his intention, which in other cases the Court is left to grope for, in the will, in plain words, viz : To provide her a "home;" five times he says she is to occupy the house ; four times she is to use it. This Court in *Meaken* v. *Duvall,* 43 Md., 372, held that "home" means actual residence. What does "residence" mean? It must be construed with reference to the meaning of the word, and residence is the essential qualification of the gift. *In re Collings,* 64 How. Pr. N. Y. 65 ; *R.* v. *N. Curry,* 4 B. & C. 959 ; *R.* v. *Oxford,* L. R. 7 Q. B. 471 ; *Astley* v. *Earl of Essex,* L. R. 18 Eq. 291 ; *Fillingham* v. *Brawley,* T. & R. 530 ; *Walcot* v. *Botfield,* Kay 534 ; *Addison* v. *Bowie,* 2 Bland, 606 ; *Shaffer* v. *Gilbert,* 73 Md. 70 ; *Thomas* v. *Warner,* 83 Md. 14 ; *Agricultural Co.* v. *Hamilton,* 82 Id. 88 ; *Penn* v. *Humboldt Ins. Co.,* 125 Mass. 277.

As the will then gives her an interest if she continues to occupy the house, this brings the case, according to NORTH J., in 1894, *Partridge* v. *Partridge,* 1 Ch. 351, within the rule laid down in *Co. Litt.,* 246 *b;* 4 *Kent Comm.,* 126 ; whereby the laches of even a *feme covert* or infant to perform the condition binds them. Neither ill-health nor any other cause is a reason for breach of the condition. *Barter* v. *Kolb,* 36 N. H. 344; *Robinson* v. *Wheelwright,* 6 DeG., M. & G. 535; *Ridgway* v. *Modechund,* 7 Beav. 437; *Harrison* v. *Foote,* 30 S. W. (Tex.) 838.

It is objected on the other side that residence means that she may leave the house whenever she pleases for her health, and stay as long as necessary, or as a doctor shall advise.

But this would nullify the condition. She might stay away forty months as well as four, and say, "Oh! well, a doctor told me (which doctor is not called) it would be unfavorable to my recovery if I undertook myself the burden of house-keeping." But why limit the exception to ill-health? Why not introduce "pleasure" as well? The cases of town and country residences don't apply, for this lady can have but one residence. She must perform the condition of the will. The case of *Wedgwood* v. *Denton*, L. R. 12 Eq. 290, is exactly like ours except the exception. There the will gave an interest just like that in our case and added "occasional absences for health or pleasure excepted." Nobody could say the will was the same with and without the exception. We insist that the Court will adhere to the words of the will. *Hunt* v. *Chesley*, 18 N. H. 373; *Reynolds* v. *Dennison*, 20 N. J. Eq. (5 C. E. Green) 218; *Kennedy's Appeal*, 81 ½ Penna. St. 103; *Cram* v. *Cram*, 63 N. H. 31; *Parker* v. *Parker*, 126 Mass. 433; *Conkey* v. *Everett*, 11 Gray 95; *Manning* v. *Wopp.* 2 Dev. & B. Eq. 11.

*Wm. Pinkney Whyte* for the appellee.

The petition alleges that Miss Dickinson has *"abandoned"* the house, and yet the solicitors for the petitioner contended in the Court below that her intention had no part in the discussion. An intent is the very essence of abandonment; the facts of each particular case are for the jury, or, in equity, for the Chancellor. 2 *Washburn on Real Property*, 5 ed. 396. The intention to abandon is material to be found as a fact. *Jamaica Pond Aqueduct* v. *Chandler*, 121 Mass. 3. It is a question of fact whether the party has abandoned his right. *Parkins* v. *Dunham*, 3 Strobb Law Rep. 224. Abandonment must consist of voluntarily giving up a thing by one having intention to abandon it. Intention is of the essence of abandonment. In the legal sense abandonment has a peculiar and technical meaning. 40 *Am. Dec.*, 464, note; *Dyer* v. *Sanford*, 9 Metc. (Mass.) 395; *Clemmins* v. *Gotshall*, 4 Yeates (Pa.) 330; *Miller* v. *Cresson*, 5 Watts & S. (Pa.) 284; *Heath* v. *Biddle*, 9 Pa. St. 273;

*Wiggins* v. *McCleary*, 40 N. Y. 346; *Bell* v. *Smith*, 2 Johns (N Y.) 98; *Wilson* v. *Pearson*, 20 Ill. 81. The fact of non-user, or the absence of appropriation to some suitable use, will not indicate any intention to abandon as a legal conclusion. *Miller* v. *Cresson*, 5 Watts & Ser. 284. To constitute an abandonment there must be an actual relinquishment of possession without the intention of returning. It was error to submit to a jury the question of abandonment when there is no evidence of relinquishment of possession. *Ibid.* To constitute an abandonment there must be the concurrence of the intention to abandon and the actual relinquishment of the property, so that it may be appropriated by the next comer. *Judson* v. *Malloy*, 40 Cal. 299; *Vogler* v. *Geiss*, 51 Md. 407. Whether there be an abandonment is a question of fact to be determined by the circumstances of the case, but a mere non-user of a way for a certain length of time is not an abandonment of the right to enjoy it, as it is always a question of intention. *Ward* v. *Ward*, 14 Eng. L.& Eq. 414.

Mere non-user does not necessarily or usually constitute an abandonment. *Emerson* v. *Wiley*, 10 Pickering, 310; *Williams* v. *Nelson*, 23 Pickering, 141; *Parkins* v. *Dunham*, 3 Strobhart's Law Reports, 224; *Elliott* v. *Rhet*, 5 Rich. 405; *Jewett* v. *Jewett*, 16 Barbour, 150; *Smiles* v. *Hastings*, 24 Barbour, 44. Non-user alone, for nine years, it seems, would not be sufficient to warrant a jury in inferring an abandonment. *Williams* v. *Nelson*, 23 Pickering, 141.

Again, in the same connection, the petition that " she has ceased to reside therein or to occupy said house *as a residence.* Domicil and residence are aptly described in the language of lawyers as one and the same, as in *Bouviers' Law Dictionary*, page 555, and cases cited. " Domicil." " The place where a man has his true, fixed and permanent home and principal establishment, and to which, whenever he is absent, he has the intention of returning." So, in *Story's Constitution*, section 1479, referring to the President of the United States, whose qualifications are that he is to be a natural born citizen of the United States, and thirty-five years old, and has been fourteen

years a resident within the United States, it is said : " By residence is to be understood not an absolute inhabitancy within the United States during the whole period, but such an inhabitancy as includes a permanent domicil in the United States."

Is there a particle of evidence to sustain such an allegation ? Is a residence to be a prison or a home to be a slave pen ? Can an occupant of a house or home in a city leave it in the summer months for the seashore or mountains without abandoning it as a residence ?    Can a poor lady, broken down in health, suffering from nervous prostration, be taken temporarily from the house or home, left to her by her relative with whom she had lived in his life-time, to a well-known sanitarium for nervous diseases, and there treated without being charged with ceasing to occupy that house as a residence ?

BRISCOE, J., delivered the opinion of the Court.

The appeal in this case is taken from an order of the Circuit Court of Baltimore City, passed on the 15th day of March, 1900, and involves a construction of the last will and testament of John S. Dickinson, of that city.    Mr. Dickinson died on the 27th of February, 1891, and his will was duly admitted to probate in the Orphans' Court of Baltimore City. By his will dated the 5th of July, 1879, he devised and bequeathed all of his property and effects, of every kind, real and personal to the Safe Deposit and Trust Company of Baltimore, in trust for certain purposes fully set out in the will.

The will contains the following clause : "The Safe Deposit and Trust Company of Baltimore shall in the first place, and in priority over all other bequests and devises made in this will, pay off and cancel a mortgage now existing on my house and lot on Saint Paul street, in the city of Baltimore, where I now reside, and known as number 299, and all incumbrances of any kind binding the same which may in any manner arise or exist ; and the said corporation shall permit the said house and lot, together with all the furniture, personal property and effects therein, to be used, occupied and possessed by my aunt, M. Matilda Dickinson, and my cousins, Maria W. Dick-

inson and Laura D. Dickinson, so long as they shall remain unmarried and shall choose to reside in the said house, and if any one or more of them shall marry or shall abandon the said house and cease to reside therein, then the said house and the furniture and the personal property and effects therein shall be for the use and occupancy of her or them who shall remain unmarried and shall choose and continue to use the said house as a residence. And I direct the said corporation to keep the said house in good and comfortable repair, and to pay all taxes, water-rents and assessments of every kind on the said house and lot so that the same may be a suitable and convenient home for my said aunt and cousins under the conditions above-named; and I direct the said corporation to pay to my aunt, M. Matilda Dickinson, and my cousins, Maria W. Dickinson and Laura D. Dickinson, the sum of three thousand dollars annually, to be paid in equal quarterly installments in advance, commencing from the time of my death, and the said payments are to be clear and free from inheritance tax and from all taxes and drawbacks of every kind whatsoever.

"The said annual sum of three thousand dollars is to be paid so long as they or any of them shall live and remain unmarried and continue to reside in the said house; but when any one or more of them shall marry or shall abandon the said house and shall cease to reside therein, then and in either of these events the said annnual sum of three thousand dollars is to be paid to the survivor or survivors of them or her who shall remain unmarried and who shall continue to reside in the said house. It being my purpose and object to provide a suitable home and maintenance for my said aunt and cousins dnring their lives and the life of the longest liver, if they choose to reside in the said house and remain unmarried. And after the death of my said aunt and my said cousins, or after they shall all marry or shall abandon the said house, and cease to reside in it, whichever of these events shall first happen, then I give, devise and bequeath the said house and lot and the sum of fifty thousand dollars to my sister, Amanda

L. Barnett, her heirs, executors and administrators, forever, provided she shall be living at the time of my death; and I direct the said corporation, upon the happening of the events aforesaid, to pay her the said sum of fifty thousaid dollars, and to secure to her the fee-simple title of the said house and lot free from all charges, expenses and incumbrances, and clear and discharged of all trusts."

On the 23rd of February, 1892, the Circuit Court of Baltimore assumed jurisdiction of the trust and the trustee was directed by a decree to administer the trusts mentioned in the testator's will, under the direction of the Court. On the 7th of July, 1898, Amanda L. Barnett, the appellant, and a sister of the testator, filed a petition in the Circuit Court of Baltimore City stating among other things that M. Matilda Dickinson, the aunt of the testator, departed this life in the year 1881; that Maria W. Dickinson, one of the testator's cousins had intermarried in March, 1895, with Judge John A. Aiken, of Mass., and that Laura D. Dickinson had abandoned the house on St. Paul street, and had ceased to reside therein and to occupy it as her residence and in fact resided elsewhere. The prayer of the petition is that the Safe Deposit and Trust Company of Baltimore, may be directed to convey the house and lot on St. Paul street to the petitioner and to pay her the sum of fifty thousand dollars, according to the terms and provisions of the testator's will,

This petition was answered by Laura D. Dickinson and the Safe Deposit and Trust Company of Baltimore on the 9th of September, 1900, admitting the death of M. Matilda Dickinson and the marriage of Maria W. Dickinson, as alleged, but denying the allegation of fact that Laura D. Dickinson had abandoned the house on St. Paul street as a residence or had ceased to reside therein. Miss Dickinson's answer contains the following averment on this subject: "that she never has abandoned the said house No. 1125 St. Paul street, in the city of Baltimore, nor has she ever ceased to reside in it or to occupy the said house, as her residence, and never has, in fact, resided elsewhere; that she has always chosen since the death

of the testator to reside in the said house and still chooses to do so ; that during the last years of the testator's life it has been the custom of the family, consisting of himself and the said Maria W. Dickinson and this respondent, to be absent from the city from six to eight weeks during the summer months. Since the death of the testator, the sisters, Maria W. and Laura D., this respondent, followed for a while the custom of the family in their summer absences and afterwards in brief autumn visits to their aunt in Massachusetts, and being in delicate health, under medical advice, your respondent has been compelled to be absent from the city from time to time temporarily but never for any prolonged period or with the intention of abandoning in any way the occupation of the house aforesaid, as her residence.

"The longest period of her absence from her home was under the advice of Dr. Reed, of Philadelphia, which was spent at Clifton Springs Sanitarium, and after returning to the St. Paul street residence, she was compelled to go to Lakewood in the care of trained nurse in 1896. She was subsequently compelled to return to the Clifton Springs until December 1st, 1897, when she returned to Baltimore. Dr. Lichty of the Sanitarium, advised her not to resume the active housekeeping in the St. Paul street residence immediately on her return to Baltimore, as the responsibility for such necessary care, would, in the delicate condition of her health at that time be unfavorable to her recovery. During all the time, since her sister's marriage in March, 1895, this respondent has at no time had any intention of abandoning her home or residence at No. 1125 St. Paul street. Her absences, temporary in character, have been solely for recreation and for her impaired health, and by the advice of physicians. She has never made any statements indicating an intention to take up her abode or residence elsewhere, for she never entertained such intention. Since March, 1895, this respondent although temporarily and at intervals absent on account of ill health or because of the heat of the city, has retained in her service one or more of the family servants. An old and faithful colored man, who has

been in the employ of the family for twenty-five or thirty years, has, all the time, had the care of the house, No. 1125 St. Paul street, and a colored woman servant, long in the employ of the family, was in charge of the house the whole of the last winter. The household furniture and furnishings, even the family silver, have remained in the house in their usual positions and condition, except as their preservation and safety from time to time required some slight changes.    The respondent's clothing, except such apparel as she needed in her visitings elsewhere, has remained in the house for use on her return.    During the last winter the house was kept warm during the cold spells and she was there often to look after it."

Now there can be no doubt as to the testator's intention, in providing for his aunt and cousins under the will.    This is clearly declared by the following language of the will itself, "It being my purpose and object to provide a suitable home and maintenance for my aunt and cousins during their lives and the life of the longest liver, if they choose to reside in the house and remain unmarried".    And he also directed that the sum of three thousand dollars was to be paid by his trustee, as an annuity so long as they or any of them shall live and remain unmarried and continue to reside in the house, but after they shall marry or shall abandon the house and cease to reside in it, then it is given to his sister, the petitioner in the case.

The petition alleges, and the answers admit, that the aunt, M. Matilda Dickinson is dead, and that the cousin, Maria W. Dickinson has intermarried since the death of the testator. The sole question, then, in the case is whether Laura D. Dickinson, one of the appellees, has abandoned the St. Paul street house as a residence, and thereby forfeited all her interest under her uncle's will.

Abandonment is defined to be a relinquishment or surrender of rights or property by one person to another, and includes both the intention to abandon and the external act by which the intention is carried into effect.    *Amer. and English Ency. of Law*, vol. 1, page 1.    In *Judson* v. *Mallory*, 40 Cal.

299, it is held, that to constitute an abandonment there must be concurrence of the intention to abandon and the actual relinquishment of the property, so that it may be appropriated by the next comer. And in *Vogler* v. *Geiss*, 51 Md. 410, this Court said, while a mere declaration of an intention to abandon will not alone be sufficient, the question whether the act of the party entitled to the easement amounts to an abandonment or not, depends upon the intention with which it was done.

We have carefully examined the record in this case and find nothing that indicates an intention upon the part of Miss Dickinson to abandon the St. Paul street house and cease to reside in it. On the contrary, it is very obvious from the evidence, that she did not intend to abandon it as a residence nor surrender it as a place of abode. Her absence from the house was always temporary in character and with an intention to return. It was generally in consequence of her physical condition and by medical advice, to regain her health. It also appears that during her absence from the house, she kept her clothing and other personal effects on the premises. Her servants were also in charge of the house in her absence, as when she was living therein. We therefore fully concur in the conclusion reached by the Circuit Court of Baltimore City, in this case, and for the reasons we have given, its order of the 15th of March, 1900, dismissing the appellant's petition will be affirmed.

*Order affirmed with costs.*

(Decided April 10th, 1901.)