# CORKRAN, HILL & COMPANY, INC.,

*vs.*

## THE A. H. KUHLEMANN COMPANY.

*Trademark—Abandonment—License for Use.*

One may be entitled to a trademark though not the manufacturer of the articles upon which it is used, it being sufficient that such articles are manufactured for him, that he controls their production, or even that they pass through his hands in the course of trade, and that he gives to them the benefit of his reputation, or of his name and business style. p. 533

One may be entitled to the exclusive use of a trademark though it is not registered, the right being one recognized by the courts in the absence of statutes declaring the existence of such rights, or providing regulations for its exercise and remedies for its deprivation. - p. 533

An abandonment is the voluntary and intentional disuse or non-user of the trademark, and while such intention may be inferred from circumstances necessarily pointing to an intention to abandon, an actual intention permanently to give up the use of the trademark is necessary. p. 534

The suspension of the use of a trademark must be, presumptively at least, attributed to indisposition or inability, rather than to an intention to abandon it. p. 534

Where consent by the owner to the use of his trademark by another is to be inferred from his knowledge and silence merely, it lasts no longer than the silence from which it springs, it being in reality no more than a revocable license. p. 534

That the owner of a trademark permitted another to use it, in connection with the name of the latter as manufacturer, and the name of the former as distributor, *held* not to establish the latter's right to use it after the withdrawal of such permission. p. 535

In a suit to restrain defendant, a manufacturer of oleomargarine, from using a trademark belonging to plaintiff corpora-

tion, which had used it for over sixty years upon various classes of its products, having registered it, however, in connection only with two of such products, ham and bacon, *held* that the fact that for several years plaintiff, having an arrangement with defendant by which the latter manufactured oleomargarine for distribution by plaintiff, furnished labels and cartons bearing such trademark to defendant, for use in connection with such oleomargarine, did not involve an abandonment by plaintiff of its right to the exclusive use of the trademark in connection with the sale of that article.                    p. 536

*Decided June 17th, 1920.*

Appeal from the Circuit Court No. 2 of Baltimore City (DAWKINS, J.).

The cause was argued, together with that next following, before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS and OFFUTT, JJ.

*Edgar Allan Poe,* with whom were *Bartlett, Poe & Claggett* on the brief, for the appellant.

*George A. Finch,* for the appellee.

PATTISON, J., delivered the opinion of the Court.

An injunction was issued by the Court below upon the bill of the appellant restraining the appellee from using a trademark known as the "Orange Brand," claimed by the appellant to be its property, in connection with the manufacture and sale of oleomargarine. The injunction, however, on motion of the defendant, was dissolved upon its filing an answer to the bill.

At the conclusion of the evidence, thereafter taken, the bill was dismissed by an order of the Court passed on the

9th day of February, 1920.   It is from that order this appeal is taken.

It appears from the evidence that the predecessors of the appellant, Corkran, Hill & Co., so early as 1855, adopted a trade-mark known as "Orange Brand," which was used by them in the sale and disposition of their goods, consisting of meat, etc.; and in 1908 Streett, Corkran & Co., one of the appellant's predecessors, registered it as a trade-mark for hams and bacon.

Prior to the year 1910, the predecessors of the appellant had in no way dealt in oleomargarine, but in the spring of that year they determined to handle it with the other articles sold by them.   After buying it for a short while from a party in New Jersey, they, in the fall of that year, began their dealings with the appellee, or rather with one of its predecessors, and continued to buy from it until 1913, but, for some reason, discontinued their purchases until the spring of 1914, when they resumed and continued with it until the fall of 1919.

The original dealings, as we have said, were started by the predecessors of the appellant and appellee, respectively, but as each has acquired the rights of its predecessor, we will hereafter, in speaking of the parties, refer to them as the appellant and appellee, unless it be found necessary to do otherwise in order to be properly understood.

At the beginning of their dealings in 1910, the appellant bought oleomargarine from the appellee, a manufacturer, at such times and in such quantities as its trade required, and at its own expense furnished the appellee labels designed by it, to be used by the appellee upon the oleomargarine manufactured for the appellant.   One of these, a round yellow label, approved by the U. S. Bureau of Industry, so early as August, 1910, had upon it the words "Orange Brand Oleomargarine, prepared especially for Streett, Corkran & Co., 115-117 Pratt Street, Baltimore, Maryland, U. S. Inspected and passed.   Establishment No. 787."   Establishment No.

787 was the manufacturing establishment of the appellee. This was placed upon the label in obedience to a requirement of the Government, that the place where such article is manufactured shall appear upon the label. Other labels, slightly differing in their wording, but all bearing the words "Orange Brand," were, from time to time, designed and furnished by the appellant to be used upon the goods bought by it. These labels were used only in connection with the oleomargarine manufactured for the appellant, and no oleomargarine bearing said trade-mark was sold by the appellee to any other person. This course of dealing continued down to September, 1914, with the exception of a short interval of a few months between the fall of 1913 and the spring of 1914.

In September, 1914, the appellant, then the firm of Corkran, Hill & Co., following an innovation of the trade, had cartons prepared in which the oleomargarine manufactured for it was to be packed by the appellee. These cartons, in addition to the words "Orange Brand," bore the symbol of a branch of an orange tree, with oranges and leaves hanging therefrom, the symbol being that which was registered in the Patent Office in 1908, and which was being generally used by Corkran, Hill & Co. upon other products sold by it. The labels or cartons were ordered and paid for by appellant and were delivered to appellee from time to time as needed down to September, 1916. In the summer of 1916, the A. H. Kuhlemann Co., the appellee, was organized and became the successor of A. H. Kuhlemann. In September of 1916, a new agreement, changing the course of dealings that had hitherto existed between the parties, was made by A. H. Kuhlemann Co. and the appellant. This agreement is not in writing, nor are its terms and provisions very clearly stated in the evidence offered. It may, however, be gathered from the record that at such time it was the policy of the newly formed company to enlarge and expand its business.

Herman Piel, manager of the appellant corporation, who had been connected with the appellant, or its predecessors,

since 1909, and who had conducted the negotiations with Mr. Kuhlemann that led to the dealings of the parties in 1910, when asked the terms and provisions of the agreement of 1916, said, "the new arrangement was that we were to supply the Kuhlemann Co. with raw material on the basis of a certain profit above cost, and they in turn were to distribute through us the oleomargarine that they manufactured, or could be sold from their factory, carrying a one-quarter cent a pound Internal Revenue Tax, with the exception of one customer which was agreed among us would stay with the Kuhlemann Co. because of reasons known between us."

The agreement, he said, included all brands of oleomargarine manufactured by the appellee that carried one quarter of a cent per pound Internal Revenue tax, and was not confined to the "Orange Brand." The witness explained that there were two kinds of oleomargarine. One of them carrying one quarter of a cent per pound Internal Revenue tax and containing no artificial coloring, and the other contained artificial coloring and carried only one-tenth of a cent per pound tax. The license held by the appellant did not permit it to handle the colored oleomargarine, but only the white, for which reason its contract or agreement with the appellee embraced only white oleomargarine.

The raw material furnished by the appellant was not manufactured by it, but bought in the open market. This, Mr. Piel said, they were not at all anxious to do, as the profits in it were extremely small, but they did it to be assured that the appellee would have on hand at all times a sufficient supply of finished product to meet the appellant's demands. The raw materials were bought by the appellant and charged to the appellee at a price above cost, and when the finished product was received by the appellant, it deducted the charge for the raw materials from the amount of the purchase price of the finished product.

The contract contained the further provision that Mr. O'Dea, the vice-president of the appellee company, should go

upon the road, in aid of the sale agents of the appellant, in an effort to increase the sales of the oleomargarine. The efforts of the parties were successful and the sales were largely increased from year to year.

Mr. Kuhlemann, when asked about the agreement of 1916, said: "I wanted to make it that they would take the whole output of the factory, just make the goods and send it to them and have them as distributors. They didn't want it, because they didn't want the yellow goods. They didn't want to invest in another license, and they agreed it would be better to distribute yellow goods from the factory, because we had the privilege of distributing it in white or color, a quarter of a cent to ten cents, so they took the distribution of the white goods and we were to make the sales for them, bring them the customers and they distribute, carry the bills, collect the money, etc., for one cent a pound and there was an overage to be divided between us, fifty-fifty, each a half."

The appellant's right to sell was exclusive "as far as they could sell the goods." Kuhlemann stated that when he approached Mr. Piel in 1916, he not only suggested that the appellant should take the whole output, the colored as well as the white goods, but he also asked it to take stock in its new company, which was then about to be organized, but the appellant refused to purchase the stock. "It, however, took up the sale proposition, which was to sell our goods at one cent a pound profit to them." It was about ten days thereafter that Piel offered to buy the raw material at a broker's profit, which was gladly accepted by the appellee.

The cartons used prior to the agreement of 1916 were continued in use thereafter so long as they lasted, but when these were exhausted and until the new ones that had been ordered were received, labels were used that had upon them the words "Orange Brand" Oleomargarine, "Always the Same, The A. H. Kuhlemann Co., Mfrs., Corkran, Hill & Co., Distributors, 221-23-25-27 S. Howard St., Baltimore, Md., U. S. Inspected and Passed by Department of Agriculture. Estab-

lishment 787." In addition to these labels, a large yellow sign was designed and used which bore the words "Ask for Kuhlemann's 'Orange Brand' Oleomargarine, Corkran, Hill & Co., Distributors, Baltimore, Maryland." These signs were distributed throughout the territory in which the "Orange Brand" oleomargarine was sold until the outbreak of the war between this country and Germany, when, because of the name "Kuhlemann" appearing upon them, the signs, or at least some of them, were torn down and their use was in a great measure discontinued. In February, 1917, the cartons that had been ordered months before were received, and were put in general use. They had upon them not only the words "Orange Brand" but also the symbol of the branch of an orange tree with oranges and leaves hanging therefrom, that was registered in the Patent Office by the appellant for its hams and bacon. It also bore the words "Prepared for Corkran, Hill & Co., Baltimore, Maryland," but nowhere upon it appeared the name of the appellee. These cartons were continued in use to the time when the relations between the parties ceased, in December, 1919.

The cause that led to the breach in the dealings between the parties is not clearly defined, but it appears from the record that in the spring or summer of 1919 the appellee contemplated a still greater development or expansion of its business operations, and with this in view it purchased, or agreed to purchase, a site upon which a larger factory was to be built. This required money which they did not have, and to obtain it they solicited the plaintiff to purchase from it certain preferred stock of the company, but they could not reach a satisfactory agreement in relation thereto, and the appellant declined to purchase the stock. Closely following this occurrence was the discovery by the appellant that in 1917, while the parties were operating under the agreement of 1916, the appellee, without the knowledge and consent of the appellant, had registered, in its name, the "Orange Brand" trade-mark for the manufacture and sale of oleomar-

garine. This fact was learned by the appellant in obtaining a copyright of the "Orange Brand" carton, which was issued to it on September 30, 1919. After learning of its registry by the appellee, Mr. Piel, with Mr. Armstrong, another official of the appellant company, called upon Mr. Kuhlemann, president of the appellee company, and demanded that he should surrender and abandon such trade-mark. Mr. Finch, vice-president of the company, was also seen and a like demand made of him, but they would not surrender or abandon the use of said trade-mark.

Because of the occurrences mentioned, as claimed by the appellant, it, in November, 1916, took up negotiations with O'Dea, who in the preceding summer had severed his relations with the appellee company, to organize a company for the manufacture of oleomargarine, and upon its organization the relations between the appellant and appellee were, on or about the 13th day of December, 1919, terminated. Thereafter the appellants continued to sell and distribute oleomargarine under the trade-mark "Orange Brand" made by the newly organized corporation, The Baltimore Butterine Company, and the customers of the appellant were notified by it that the "Orange Brand" oleomargarine was no longer manufactured by the appellee, but by the Baltimore Butterine Company. The appellee thereafter manufactured and sold to its customers oleomargarine under the "Orange Brand" trade-mark, and when asked to discontinue its use, refused to do so; whereupon the appellant instituted these proceedings asking for an injunction restraining the appellee in the use of the "Orange Brand" trade-mark, and for the recovery of the profits realized by the appellee from the alleged wrongful sale of oleomargarine under such trade-mark.

The record in this case is quite a large one, and contains facts that we have thought unnecessary to state, in as much as we have already prolonged this opinion much further than desired, but though not mentioned, such facts have been carefully considered by us in reaching our decision.

The appellee contends that "it acquired the right of owner-ship to 'Orange Brand' trade-mark upon oleomargarine by user from May, 1914, by adoption in August, 1916, by its registration in February, 1917, in the U. S. Patent Office"; and that the appellant never acquired a right thereto, but if so, it lost it by abandonment, or if not by abandonment, by appellant's acquiescence in its use by the appellee.

The appellant was not the manufacturer of the article. This was not necessary to entitle him to the use of the trade-mark, for its use "does not necessarily and as a matter of law import that the articles upon which it is used are manufac-tured by its user. It may be enough that they are manufac-tured for him, that he controls their production, or even that they pass through his hands in the course of trade, and that he gives to them the benefit of his reputation, or of his name and business style." *Nelson* v. *Winchell,* 203 Mass. 75; *Menendez* v. *Holt,* 128 U. S. 514; 38 *Cyc.* 688; 26 *R. C. L.* 836. Nor was it necessary that the trade-mark should have been registered by the appellant to entitle it to its use, or to protect it against infringement.

From an early day the common law has recognized the right of the proprietor of a trade-mark to its exclusive use. The right has been, without interruption, recognized and pro-tected by the courts of England and the United States, in the absence of statutes declaring the existence of such rights or providing regulations for its exercise and remedies for its deprivation. 26 *R. C. L.* 834, and cases cited in note thereto.

It is conclusively established by the evidence in this case that the appellant, or its predecessor, designed, adopted and used the "Orange Brand" trade-mark in the sale by it of oleomargarine, and thereby acquired the exclusive right to its use for such purpose, and unless it has abandoned that right or has lost it by its acquiescence in the use of it by the appel-lee it still has it.

An abandonment is the voluntary and intentional disuse or non-user of the trade-mark. Such intention may be in-

ferred from circumstances necessarily pointing to an intention to abandon, but an actual intention to permanently give up the use of the trade-mark is necessary to constitute an abandonment of it. Mere disuse, though for a considerable period, in the absence of intentional abandonment, will not amount to an abandonment, nor will it destroy trade-mark rights, unless the mark has ceased to be distinctive and the good will associated with it has passed away, or the mark has become identified with other goods. 38 *Cyc.* 880; *Nims on Trade-marks* (Edition Pub. in 1909), page 503; *Julian* v. *Hoosier Drill Co.,* 78 Ind. 413.

In *Julian* v. *Hoosier Drill Co., supra,* it is said: "The suspension (of the use of a trade-mark) must be, presumptively at least, attributed to indisposition or inability, rather than to an intention to abandon valuable rights," and "it is incumbent upon those alleging the defense of abandonment, to show that the right had been relinquished to the public by clear and unmistakable evidence." It may be, as said by *Browne on Law of Trade-marks,* Sec. 681, that "a person may temporarily lay aside his mark, and resume it, without having in the meantime lost his property in the right of user. Abandonment being in the nature of a forfeiture must be strictly proven."

In *Menendez* v. *Holt, supra,* a case very similar to the one before us, it is said when the excuse of the party using another's trade-mark "is that the owner permitted such use, that excuse is disposed of by affirmative action to put a stop to it. Persistence then in the use is not innocent, and the wrong is a continuing one, demanding restraint by judicial interposition when properly invoked. Mere delay or acquiescence cannot defeat the remedy by injunction in support of the legal right, unless it has been continued so long and under such circumstances as to defeat the right itself. * * * Acquiescence to avail must be such as to create a new right in the defendant. *Rodgers* v. *Nowill,* 3 De Gex, M. & G. 614. Where consent by the owner to the use of his trade-mark by

another is to be inferred from his knowledge and silence merely; it lasts no longer than the silence from which it springs; it is, in reality no more than a revocable license.' *Amoskeag Mfg. Co.* v. *Spear,* 2 Sandf. (N. Y.)." *Nelson* v. *Winchell, supra.*

It is clear, upon an application of the principles of law above stated to the facts of this case, that the exclusive right of the appellant to use the trade-mark "Orange Brand" in the sale of oleomargarine was not abandoned by it, nor was such right lost by it, because of its alleged acquiescence in the use of it by the appellee, consequently its use was never acquired by the appellee, as claimed by it.

The appellant's acts of abandonment and acquiescence upon which the appellee relies in this case are: First, the failure of the appellant, in its early dealings with the appellee, to use, at all times, labels upon its goods which indicated its ownership of the trade-mark "Orange Brand"; second, its use of cartons upon which the "Orange Brand" trade-mark appeared, but not the name of the appellant's, nor anything indicating the appellant's connection with it; third, the use, after the agreement of 1916 and after the labels and cartons then on hand had been used, and while awaiting the receipt of those that had been ordered, of other labels and a sign having the "Orange Brand" trade-mark upon them and upon which for the first time appeared the name of the appellee. On these the appellee was named as the manufacturer and the appellant as the distributor of the goods. In the preparation of these labels and signs, the appellee for the first time made certain suggestions to the appellant as to the wording of them. Their suggestions, after modification, were accepted by the appellant and the labels used and the signs posted, but when the new cartons were received they were largely discontinued and the new cartons were put into general use. They, like the earlier ones, bore the "Orange Brand" trade-mark containing the name of the appellant, but nowhere upon them appeared the name of the appellee. These were

used until the relations of the parties were severed in the fall or winter of 1919.

Much reliance is placed by the appellee upon the use of the large yellow sign that was used only for a short while, or at least, in a short time thereafter, upon the outbreak of the war with Germany, its use was very materially reduced because of the hostile feeling thereto caused by the use of the name "Kuhlemann" appearing upon it.

It is because of the expression "Kuhlemann's Orange Brand Oleomargarine," appearing upon the sign by the permission of the appellant, that the appellee relies so much in its claim to the ownership of said brand.

There is nothing in the agreement of 1916, so far as the record discloses, indicating any intention of the appellant to surrender to the appellee its rights to the use of its "Orange Brand" trade-mark. The appellant, after such agreement, continued to design, order and pay for the labels and cartons that were to be used under that contract, and their costs became a part of the cost of the finished product.

There is nothing in the record showing that the appellant by permitting the temporary use of such labels and signs intended to surrender his exclusive right to the use of the "Orange Brand" trade-mark in the sale of oleomargarine. It is inconceivable to us that such was its intention. The "Orange Brand" trade-mark meant much to the appellant. For more than sixty years it had used this brand upon other products sold by it with great results. It was this brand that it had selected and used to designate and identify its best and highest grade of goods and by it the superior quality of said goods was commended to the public.

After the use of this brand for more than fifty years and fully appreciating its value, the appellant registered it in 1908 for hams and bacon. It not only used it thereafter on hams and bacon, but upon beef, cheese, sausage and other articles sold by it. In 1908 the appellant was not selling oleomargarine, but when it commenced its sale in 1910, it

very naturally selected this brand or trade-mark as one to use in commending their highest and best grade of oleomargarine offered for sale by it. It is true it never registered the trade-mark for oleomargarine nor did it register it for its other products, except ham and bacon. This it said was due to the fact that it felt secure in its common law rights thereto.

That it was not its intention to abandon the "Orange Brand" trade-mark in the sale of oleomargarine, nor to surrender the same without consideration to the appellee, is shown by the fact that so late as 1919, after the use of the label and sign mentioned, it obtained a copyright for the "Orange Brand" carton to be used in the sale of oleomargarine. This it would never have done had it intended to abandon the use of the "Orange Brand" trade-mark in the sale of oleomargarine.

The appellant was a large dealer in the products sold by it. It had many salesmen upon the road, and with its prestige and business reputation, aided it is true by the efforts of the appellee, the sales of the "Orange Brand" oleomargarine largely increased from year to year. The increased sales inured to the benefit of the appellee, in that it increased the amount of its output. Before its association with the appellant and before the latter's zeal and energy was exerted in the sale of its products, the appellee was comparatively speaking a small concern.

The efforts of the appellee, as manufacturer of the oleomargarine sold under this brand, in keeping up its high standard of quality, may have largely aided in increasing its sales, but because of such fact, it could acquire no right to it against the consent of the appellant, when in its agreement with the appellant it had made no provision in respect thereto.

The record discloses that in 1919 the aggregate sales of all products sold by the appellant amounted to over eight million of dollars and of this amount 90% thereof came from the sale of goods bearing its "Orange Brand" trade-mark.

It is not shown from the evidence that the appellant ever abandoned said trade-mark or lost its exclusive right to use it by laches or acquiescence.

In our opinion the appellant has the exclusive right to the use of the "Orange Brand" trade-mark in the sale of oleomargarine, and the continued use of it by the appellee is an infringement upon that right.   Consequently the Court below erred in not granting a permanent injunction restraining the appellee in the use of said trade-mark.

The decree appealed from will be reversed and the case remanded in order that a permanent injunction may be granted and evidence taken, if desired, upon the prayer of the appellee asking for an accounting.

> *Decree reversed and cause remanded, costs to be paid by the appellee.*