ALBERT LANDAY *v.* BOARD OF ZONING APPEALS
ET AL.
[No. 93, October Term, 1937.]

*Decided January 13th, 1938.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Isaac Lobe Straus,* with whom was *Benjamin Goldman* on the brief, for the appellant.

*J. Francis Ireton, Assistant City Solicitor,* with whom was *R. E. Lee Marshall, City Solicitor,* on the brief, for the appellees.

OFFUTT, J., delivered the opinion of the Court.

This appeal invokes the construction of that part of Ordinance No. 1247 of the Mayor and City Council of Baltimore, approved March 30th, 1931, known as the Zoning Ordinance of Baltimore City, which provides that nothing contained therein shall be construed to "prevent the continuance of any use" which legally existed when that ordinance was passed.

The appellant is the owner of four shallow "store fronts" on Greenmount Avenue in Baltimore, and he also owns a lot adjacent to and north of those lots which in part abuts both on Greenmount Avenue and Lafayette Avenue, and is known as No. 439 East Lafayette Avenue. Lafayette Avenue, running east and west, stops at that point, at Greenmount Avenue, opposite Greenmount Cemetery.

The appellant acquired the property from William A. Laibowitz, apparently in the fall of 1936, but he had occupied it before that as a tenant of Laibowitz. In February, 1926, Laibowitz, the then owner, leased to A. J. Kuhnert and Samuel George Smith three of the "store fronts," known as Nos. 1716, 1718, and 1720 Greenmount Avenue. Kuhnert and Smith occupied and used the property so leased as a junk shop from that time until May, 1932, when they gave up the junk business and vacated the property, which remained vacant until Landay occupied it as a tenant of Laibowitz in October, 1935. Lindsay Armstrong appears to have occupied and used No. 1722 Greenmount Avenue as a tailoring and boot black shop from August 16th, 1921, until April 1st, 1932.

Although he had no permit authorizing him to do so, Landay, when he occupied the properties known as Nos. 1716, 1718, and 1720 Greenmount Avenue as a tenant of Laibowitz in 1935, used them as a junk shop, and, after he bought them from Laibowitz he applied to the build-

ings engineer of Baltimore City for a certificate of occupancy for the Greenmount Avenue properties for use as a junk shop, and for an extension of that use to No. 439 East Lafayette Ave. The application was disapproved, and Landay then appealed to the Board of Zoning Appeals, which, after a hearing, sustained the action of the buildings engineer. He then filed a petition in the Baltimore City Court asking it to review and reverse the decision of the Board of Zoning Appeals, and from the adverse decision of that court he took this appeal.

While there is some obscurity and some confusion in the testimony, without reviewing it in detail it is sufficient to say that it establishes these facts: (1) That No. 1722 Greenmount Avenue never was used as a junk shop or part of a junk shop until Landay occupied the property in 1935; (2) that Nos. 1716, 1718, and 1720 Greenmount Avenue were used as a junk shop from 1926 until 1932; that from 1932 until October, 1935, they were vacant; and that during that interval they were not used except casually for any purpose. There was testimony that for a short time, perhaps two months, the occupants of 1712 and 1714 Greenmount Avenue stored some furniture in No. 1716, but it failed to show that the persons who so used it occupied it as a business place; while the testimony of Laibowitz, the then owner, is clear that, after Kuhnert and Smith vacated the property in 1932 until it was rented to Landay, he had not rented it to any one. There was also testimony that from June, 1935, until some time in the fall of the same year, John King occupied Nos. 1720 and 1722 Greenmount Avenue and used those properties as a vulcanizing shop. But while it was sufficient to show that he so used No. 1722 in connection with No. 439 Lafayette Avenue, on which his advertising sign appeared, it was not sufficient to show that he used at any time No. 1720 Greenmount Avenue.

The appellant voluntarily withdrew his application for the extension of the use of Nos. 1716, 1718, 1720, and 1722 Greenmount Avenue to No. 439 East Lafayette Avenue, and as the evidence failed to show that No. 1722 was

ever used as a junk shop prior to its occupation by Landay, we are concerned here only with Nos. 1716, 1718, and 1720 Greenmount Avenue.

The appellant contends on those facts that, at the time the ordinance was passed, those properties were affected by a non-conforming use; that his right to continue that use of them was not lost by the fact that for more than three years after May 1st, 1932, they were vacant, and not used for any purpose; that that right cannot be lost by mere cessation or discontinuance of the use, but only by a change of the use; and that consequently he is entitled to continue the non-conforming use, and to receive a certificate of occupancy authorizing him so to do.

The appellees, on the other hand, contend that discontinuance of the non-conforming use for a continuous period of more than three years is conclusive evidence that the owner of the property had abandoned his right to the non-conforming use, that under the terms of the ordinance the proposed use could not be authorized, and therefore that the certificate authorizing such use was properly refused.

Those parts of the ordinance which are relevant to the question raised by those contentions follow:

"Section 4: '* * * In an Industrial use district * * * no land or building shall be used * * * for * * *

"14. Junk (scrap paper, metals, bottles, rags, rubber) yard or shop for purchase, sale, handling, bailing or storage * * * unless by authority of an ordinance. Such authority may be granted by ordinance of the Mayor and City Council of Baltimore in industrial use districts only.'

"Section 6: '* * * In a second commercial use district * * * no land or building shall be used * * * for * * *

" '35. Junk (scrap paper, metals, bottles, rags, rubber) yard or shop for purchase, sale, handling, bailing or storage of these. * * *'

"Section 11: 'Non-conforming Uses. A non-conforming use is a use that now exists and that does not comply with the regulations for the use district in which it is

established. A non-conforming use may not be extended, except as hereinafter provided. * * * A non-conforming use, if changed to a use of a higher classification may not thereafter be changed to a use of a lower classification. If a use, for which an ordinance is required under the provisions of Paragraph 4, is changed to a use for which no ordinance is required under those provisions, it may not thereafter be changed to a use for which an ordinance is required without such an ordinance. Nothing contained in this ordinance shall be construed to prevent the continuance of any use which now legally exists.' "

It is apparent from an examination of the facts, the ordinance, and the contentions of the parties, that the decisive and controlling question in the case is whether the right to a non-conforming use may be lost except by changing the use of the property to a use of a higher classification, or, more narrowly stated, whether the mere cessation or discontinuance of the use without more is sufficient to deprive the owner of the right to resume and continue it irrespective of the duration of the period of discontinuance.

The ordinance provides that it shall not be construed to prevent the "continuance of any use which now legally exists." Under its terms the only manner in which the right to a non-conforming use may be lost is by a change of such use to one of a higher classification. It does not refer directly to a mere cessation of use, or to the effect of any such cessation, so that the conclusion that the right may be lost by cessation or discontinuance can only be reached by inference and implication. The junk business is both licensed and regulated by the State (Code, art. 56, sec. 234; Code Pub. Loc. Laws, art. 4, sec. 663R et seq.; *State v. Shapiro,* 131 Md. 168, 170, 101 A. 703, and is not, therefore, in itself illegal.

In a constitutional sense, the only justification for the restrictions imposed by such laws as the ordinance under consideration on the use of private property is the protection of the public health, safety, or morals. *Goldman v. Crowther,* 147 Md. 282, 128 A. 50; *Tighe v. Osborne,*

149 Md. 349, 131 A. 801; *Tighe v. Osborne*, 150 Md. 452, 133 A. 465; *R. B. Construction Co. v. Jackson*, 152 Md. 671, 137 A. 278. It is obviously true that the operation of a junk shop in or near a residential section of a great city carries always a potential menace to the public health and safety, since its essential purpose is to gather in one place large quantities of such highly inflammable matter as paper and rags, discarded garments, and other like waste material, which are collected wherever they may be found, and which may also carry the germs and seeds of communicable disease. Nevertheless, the business is lawful, since the State regulates and licenses it, and has committed to the municipal authorities the duty of seeing that it is so managed as to prevent any avoidable peril to the public health or safety. So, without expressing any opinion as to whether the Legislature might or could have prevented the continuance of such a business at all in such a locality, we are concerned here only with the interpretation of what the ordinance actually does say with respect to this particular business, and its language in reference to it must be interpreted in the same manner as though it referred to any other lawful business. In other words, its construction is not affected by the fact that the business may be highly offensive to the senses, as well as a constant threat to the public health and safety.

Such ordinances are in derogation of the common law right to so use private property as to realize its highest utility, and while they should be liberally construed to accomplish their plain purpose and intent, they should not be extended by implication to cases not clearly within the scope of the purpose and intent manifest in their language. *Monument Garage Corporation v. Levy*, 266 N. Y. 339, 194 N. E. 848.

Since the ordinance provides one way, and only one way, in which a non-conforming use may be lost, to supply another way in which such a right may be lost would be to do what the Mayor and City Council alone was authorized to do, but which it refrained from doing. Since,

therefore, the ordinance does not provide that mere cessation of the non-conforming use shall prevent its resumption, this court is not authorized to give to such cessation that effect. That conclusion is qualified of course by the consideration that, as a competent person may give away, throw away, sell, or surrender any property right which he may have, he may also abandon it. That power, however, exists apart from the ordinance and not as a consequence of it.

Decisions in cases dealing with the effect of the cessation or discontinuance of a non-conforming use naturally turn on the language of the particular ordinance or statute under consideration.

In *Darien v. Webb,* 115 Conn. 581, 162 A. 690, the ordinance provided that any non-conforming use "may be continued." At the time of its passage, the property involved was used as a restaurant. After that it was rented and used as a dwelling, once for two months, again for three months; it was rented and used for the storage of building material, it was vacant for a time, and for a time the owner permitted a former tenant to store her furniture there. It was held that these several uses broke the continuance of the non-conforming use. In that connection the court said: "Under this construction temporary non-occupancy of the premises or interruption or suspension of a non-conforming use without substitution of a conforming use or conduct significant of abandonment would not work a termination of the right to resume the former, but this result ensues from such a definite and substantial departure from the previously existing conditions and nature of use as is constituted by the use of the defendant's premises for residence purposes in 1927 and 1928. The resumption of business uses thereafter cannot fairly be regarded as a 'continuance' of the business uses which preceded the period of residential occupancy."

In *Lehmaier v. Wadsworth* (1937), 122 Conn. 571, 191 A. 539, the defendant owned land used as an airport, but at the time the ordinance affecting the property was

passed that use had been discontinued. The trial court found such discontinuance, but held that the non-conforming use had not been lost because the property had not been devoted to a conforming use before resumption of the non-conforming use. In reviewing that conclusion, the appellate court said: "The temporary interruption or suspension of a non-conforming use without substitution of a conforming one or such a definite and substantial departure from previously existing conditions and uses as to signify an abandonment of the latter does not terminate the right to resume them. *Darien v. Webb*, 115 Conn. 581, 586, 162 A. 690; *State, ex rel. Schaetz v. Manders*, 206 Wis. 121, 238 N. W. 835. Even if the defendant had in mind the possibility of a future change in use, so long as his operations had a legitimate present purpose and utility appropriate to the existing uses, there would not be such departure from the latter as to require a finding of a present change terminating his right to continue them. No such substantial change can be made in the finding as would vitiate the conclusion that the property has not been devoted to a conforming use in substitution for those which were non-conforming."

In *Wilson v. Edgar*, 64 Cal. App. 654, 222 Pac. 623, the ordinance provided that discontinuance of the non-conforming use for 180 days prevented its resumption, so that the decision in that case is not in point.

*Rehfeld v. San Francisco*, 218 Cal. 83, 21 Pac. (2nd) 419, related to the extension of a non-conforming use, and not to the resumption of such a use after it had ceased.

*Van Horn v. New Orleans*, 161 La. 767, 109 So. 484, held that a property affected by a non-conforming use, but which was vacant when the plaintiff bought it, must conform. No authority was cited for the conclusion announced, nor was there any definite reference to the statute or ordinance, although the court spoke of a "vacancy limit" as though that may have affected its decision.

The ordinance construed in *State v. Baumhauer*, 234

Ala. 286, 174 So. 514, prevented the resumption of a non-conforming use which had been "discontinued."

In *Appeal of Haller Baking Co.*, 295 Pa. 257, 145 A. 77, 79, the court, in construing the words "existing use" and "discontinued," said:

"The expression 'existing use,' though difficult to define, is, as a fact, not difficult of determination. As understood in the ordinance, 'existing use' should mean the utilization of the premises so that they may be known in the neighborhood as being employed for a given purpose; i. e., the conduct of a business. Ordinarily an existing use for business combines two factors: (a) Construction or adaptability of a building or room for the purpose, and (b) employment of the building or room or land within the purpose. Any use, within a recognized business purpose, would be an existing use. * * * Where a property is built for or adapted to a particular use, the question of existing use is determined by ascertaining as near as possible the intention of the owner, in connection with the fact of a discontinuance or apparent abandonment of use; it is not to be determined on the basis of actual or substantial use on the date of the adoption of the ordinance.

"An understanding of the phrase, 'if such use is discontinued,' which is employed in the ordinance, is helpful, for the property must be in a discontinued state to enable the board to hold that it was not an existing use when the ordinance was adopted. The word 'discontinued' here, to have any legal effect, must be the equivalent of 'abandonment.' "

The reasoning as well as the conclusions in these cases is consistent with the principle that, unless so stated in the statute, cessation or discontinuance of a non-conforming use without the substitution of another use, or without evidence of an intent to abandon the non-conforming use, will not prevent its resumption.

Abandonment in law depends upon the concurrence of two, and only two, factors; one an intention to abandon or relinquish; and two, some overt act, or some failure

to act, which carries the implication that the owner neither claims nor retains any interest in the subject-matter of the abandonment. 1 *C. J. S. Abandonment,* 8. Time is "not an essential element" of abandonment, although the lapse of time may be evidence of an intention to abandon (*Id.,* 9, 16), and where it is accompanied by acts manifesting such an intention it may be considered in determining whether there has been an abandonment. Nor is mere non-user evidence of abandonment unless it continues for the statutory period of limitations of actions to recover the right or property. *Id.,* 16. It is said too that: "It is a universally accepted principle that mere non-user of property over a period of time, when unaccompanied by any other acts indicating an intention to relinquish or abandon title thereto or ownership thereof, does not amount to an abandonment." 1 *C. J. S.* 10.

In *Corkran, Hill & Co. v. Kuhlemann Co.,* 136 Md. 525, 533, 111 A. 471, 474, Judge Pattison for this court said:

"An abandonment is the voluntary and intentional disuse or non-user of the trade-mark. Such intention may be inferred from circumstances necessarily pointing to an intention to abandon, but an actual intention to permanently give up the use of the trade-mark is necessary to constitute an abandonment of it. Mere disuse, though, for a considerable period, in the absence of intentional abandonment, will not amount to an abandonment, nor will it destroy trade-mark rights, unless the mark has ceased to be distinctive, and the good will associated with it has passed away, or the mark has become identified with other goods. 38 *Cyc.* 880; *Nims on Trade-Marks* (Ed. 1909), page 503; *Julian v. Hoosier Drill Co.,* 78 Ind. 408, 413.

"In *Julian v. Hoosier Drill Co., supra,* it is said: 'The suspension (of the use of a trade-mark) must be, presumptively at least, attributed to indisposition or inability, rather than to an intention to abandon valuable rights,' and 'it is incumbent upon those alleging the defense of abandonment to show that the right had been

relinquished to the public by clear and unmistakable evidence.' "

See, also, *Canton Co. v. Baltimore City*, 106 Md. 69, 66 A. 679, 67 A. 274; *Barnett v. Dickinson*, 93 Md. 258, 267, 48 A. 838; *Vogler v. Geiss*, 51 Md. 407; *Interstate Distilleries, Inc., v. Sherwood etc. Co.*, 173 Md. 173, 195 A. 387.

Tested by those principles the record in this case submits no evidence sufficient to prove legal abandonment. Laibowitz, the owner of the property at the time the ordinance was adopted, did nothing which was inconsistent with an intention to continue the non-conforming use. The fact that one Leonard, who was engaged in the furniture business at 1712 and 1714 Greenmount Avenue, was permitted to store or leave pieces of furniture in No. 1716 for a short time, considered in connection with other facts in the case, is not sufficient to show a conforming use. Laibowitz said that to the best of his knowledge he had received no revenue from the property from 1932 until he leased it to Landay, and that he did not know that it had been occupied by anybody for the storage of furniture. One witness said that a few pieces of furniture were stored in No. 1716 for a month of two; another, that a "man stored a little bit of furniture there at one time." There was no evidence that any business of any kind was carried on in any one of the three properties after Kuhnert and Smith vacated them until Laibowitz leased them to Landay. It may also be reasonably assumed that they were vacant during that period, not because Laibowitz had abandoned the non-conforming use, but because he was unable to rent them for that or for any use until he rented them to Landay. It follows that a certificate of occupancy should have been issued to Landay for the use of Nos. 1716, 1718, and 1720 Greenmount Avenue as a junk shop, and that his application for a like permit for No. 1722 Greenmount Avenue was properly refused.

The order from which the appeal was taken must therefore be reversed in part, and affirmed in part, and the

case remanded for such further proceedings as may be required to authorize the buildings engineer of Baltimore City to issue the requisite permit.

> *Order reversed in part and affirmed in part, and case remanded for such further proceedings as may be required to authorize the buildings engineer of Baltimore City to issue to the appellant a certificate of occupancy for the use of properties numbered 1716, 1718, and 1720 Greenmount Avenue in Baltimore City as a junk shop; the appellees to pay the costs of this appeal.*