736 A.2d 1072

**Anne Marie WHITE et al.**

v.

**John C. NORTH, II, Chairman.**

**No. 85, Sept. Term, 1998.**

Court of Appeals of Maryland.

Sept. 14, 1999.

32

William M. Simmons, Annapolis, for petitioners.

Marianne D. Mason, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, on brief), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

Reargued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL, and ROBERT L. KARWACKI (retired, specially assigned), JJ.

CATHELL, Judge.

Petitioners Anne and Richard White seek the reinstatement of a decision by the Anne Arundel County Board of Appeals (Board) granting their request for a zoning variance to construct an in-ground concrete swimming pool in the sloped back yard of their home. On judicial review, the Circuit Court for Anne Arundel County reversed the Board, ruling its decision was "arbitrary and capricious." The Court of Special Appeals affirmed the circuit court.[1]

Petitioners present three questions for our review:

1. Did the Decision of the Court of Special Appeals effectively render meaningless and of no practical effect the Critical Area variance provisions required by the Critical Area Act, and as set forth in Article 3, Section 2–107(b) of the Anne Arundel County Code, by concluding that "unwarranted hardship" requires that the property owner be deprived of *all* reasonable use of their property before a variance can be granted[?]

2. What is the correct standard to use in evaluating the requirement of "unwarranted hardship," as that term is used in the Critical Area variance statute[?]

3. Does the taking of private property rights, which does not result in a denial of all reasonable use of the land, constitute an unconstitutional taking of property when the

---

1. After the case *sub judice* originally was argued, this Court granted a writ of certiorari in *Belvoir Farms Homeowners Association, Inc. v. North*, 355 Md. 259, 734 A.2d 227 (1999). *Belvoir Farms* raised issues involving the legislative history of the critical area variance statutes. Accordingly, we ordered that the case at bar be reargued on the same day as *Belvoir Farms*.

taking fails to serve the stated public purpose or the state police power[?]

We shall address questions one and two together. In light of our determination with respect to questions one and two, it is not necessary to address the third question.

We vacate the judgment of the Court of Special Appeals and direct that this case be remanded to the Anne Arundel County Board of Appeals for further proceedings consistent with this opinion and our holding in *Belvoir Farms Homeowners Ass'n, Inc. v. North*, 355 Md. 259, 734 A.2d 227 (1999).

## I. The Chesapeake Bay Critical Area Protection Program

To understand fully the legal underpinnings of this case, a brief explanation of the Chesapeake Bay Critical Area Protection Program (Critical Area Program) is in order. The Critical Area Program is codified in Maryland Code (1974, 1990 Repl.Vol., 1998 Cum.Supp.), sections 8–1801 to 8–1816 of the Natural Resources Article. Respondent is the Chairman of the Chesapeake Bay Critical Area Commission (Commission), an arm of the Department of Natural Resources with authority to enforce the Critical Area Program. Title 27 of the Code of Maryland Regulations (COMAR) consists of the Commission's regulations.

It is important to understand the interrelationship between the State-imposed, but locally enforced, critical area prohibitions and local zoning requirements generally. Section 8–1802 of the Natural Resources Article provides:

(a) *Definitions.* ...

. . . .

(11)(i) "Project approval" means the approval of development ... in the Chesapeake Bay Critical Area by the appropriate local approval authority.

(ii) "Project approval" includes:

. . . .

3. Issuance of variances, special exceptions, and conditional use permits. ...

Section 8–1808(a)(1) requires local governments to have primary responsibility for development of programs to regulate land use in the critical area, "subject to review and approval by the Commission." The program, "[a]t a minimum," must include "[z]oning ordinances or regulations." § 8–1808(c). Pursuant to these provisions, the Commission oversees the local governments in the adoption of zoning regulations for the critical area, including variance provisions acceptable to the Commission.[2] Once local critical area programs are adopted and approved, the programs can, depending upon their language, impose additional or different limitations. In the ordinance at issue here, Anne Arundel County has established different criteria for variances in the critical area.[3] *See* Anne Arundel County Code (1996), Art. 3, § 2–107(b) (hereinafter County Code).

Finally, section 8–1812 confers full standing to the Chairman of the Commission to intervene in any administrative or judicial proceeding arising out of local project approval in the critical area, subject to withdrawal if thirteen members of the Commission oppose the intervention within thirty-five days. *See North v. St. Mary's County,* 99 Md.App. 502, 508, 638 A.2d 1175, 1178 (noting that section 8–1812 confers "unrestricted" standing upon the Commission to appeal any administrative or judicial decision impacting the Critical Area Program), *cert. denied sub nom. Enoch v. North,* 336 Md. 224, 647 A.2d 444 (1994).

Also crucial to this case is the "buffer" the Commission requires local jurisdictions to create. *See* COMAR 27.01.09.01.C.(1). A buffer is defined in COMAR 27.01.09.01.A as "an existing, naturally vegetated area, or an area established in vegetation and managed to protect aquatic, wetlands, shoreline, and terrestrial environments from man-made distur-

---

**2.** If a local government opts out of establishing a program, the Commission is empowered to establish a program. § 8–1809(b).

**3.** *Belvoir Farms,* 355 Md. at 266 at n. 4, 734 A.2d at 231 at n. 4, discussed the history behind the adoption of these criteria in Article 3, section 2–107(b) of the County Code.

bances." The buffer must extend at least 100 feet from any tidal waterway, wetland, or tributary of the Chesapeake Bay, but localities must expand the buffer "to include contiguous, sensitive areas, such as steep slopes ... whose development or disturbance may impact streams, wetlands, or other aquatic environments." COMAR 27.01.09.01.C.(1) & (7). County Code, Article 28, section 1A–104(a)(1) states: "If there are contiguous slopes of 15% or greater, the buffer shall be expanded ... to the top of the slope ... and shall include all land within 50 feet of the top of the bank of steep slopes." Within that buffer, the Commission bans any new development of all "impervious surfaces" that are not "water-dependent," which includes concrete swimming pools.[4] COMAR 27.01.09.01.C.(2). The only way to build any impervious structure like petitioners' swimming pool is to apply and qualify for a variance under local zoning ordinances.

## II. Background

In 1983, petitioners purchased a 1.52 acre lot in Anne Arundel County, Maryland, near Martins Cove, a waterway that ultimately flows into the Chesapeake Bay. Their property is not waterfront property and would not be within the critical area except for a determination by county authorities that it is now within the expanded buffer area. They began improvements on the lot in 1987 and began construction of their home in 1990. In its then existing, natural state, petitioners' lot had a gradual slope of less than 15%, therefore keeping it outside the scope of Anne Arundel County's definition of an expanded buffer zone. When petitioners began construction of their

---

4. " 'Impervious surface' means hot bituminous asphaltic pavement, cold mix asphaltic pavement, compacted gravel surfacing, and portland cement concrete used for roads, sidewalks, driveways, curb and gutter, patios, porches, *swimming pools*, tennis courts, parking areas, and principal and accessory structure coverage areas." County Code (1998), Art. 28, § 1–101(33D) (emphasis added). " 'Water-dependent facilities' means those structures or works associated with industrial, maritime, recreational, educational, or fisheries activities that require location at or near the shoreline within the Buffer...." COMAR 27.01.03.01.A.

house, dirt from the excavation was pushed into the rear of the lot, creating an artificial slope of greater than 15%. It is this artificially created area that is at issue here. The record is unclear as to whether this artificially created area is contiguous with any natural buffer area. It is also unclear whether the area between the artificial slope and the waterway is itself at a 15% or more grade. Plans for the house apparently were approved by Anne Arundel County officials and, as built, complied with that approval. There is no indication in the record that any deviation from the approved plans occurred. During the planning and construction of their home, petitioners hoped to build, but never began construction of, the in-ground swimming pool, deck, and patio. Had they built the pool before the house, or at the same time as the house, it would not have been in the buffer zone. In 1995, petitioners began planning these accessory structures. The backyard where the artificial slope had been created was chosen as the location to construct the pool.

By the time permits were sought for the pool, deck, and patio, the backyard of petitioners' property no longer had a slope of less than 15% leading down toward Martins Cove, because the slope had been increased by the petitioners during the construction of their house. Although in its preexisting natural state, the background area was not a buffer zone, it was deemed to be in the "expanded buffer" zone created by the County under the authority of the Critical Area Program because they had increased the slope. *See* County Code (1998), Art. 28, § 1A–104(a)(1). As we have indicated, however, the record is unclear as to whether the area of the slope created by the Whites' excavation abuts on a slope that is itself at a grade of 15% or more and thus an expanded buffer zone.[5] A County ordinance required that petitioners apply for a zoning variance to site the pool behind their house. *See* County Code (1996), Art. 3, § 2–107. Petitioners applied

---

**5.** We resolve this case based on the presumption that the "enhanced buffer zone" created by the Whites abuts on a buffer, or expanded buffer, zone. We do not address whether the ordinance would apply if the subject site did not abut on a buffer zone.

for the variance, but an administrative hearing officer denied their request. An appeal to the Board followed.[6]

The Board reversed the decision of the hearing officer in a three-to-two decision. As this decision is the basis for the proceeding before us, we shall review the relevant portions of the record of this hearing. Petitioner Anne White was the first to testify. During her testimony, she revealed that originally there "was a gradual slope, but ... this 15 percent slope [was] created by the excavation" done during the approved construction of the house. When asked about her need for the pool, she replied, "Well, to enjoy it. Several of my friends have pools on waterfront properties.... I have a youngster who is interested in swimming, as—just as a course of relaxation and enjoyment, and just as part of enjoying my house." She also stated:

> I cannot put [the pool] in my front yard because of the covenants in our community.[7] And, from aesthetic points of view, I don't think I'd want it there.

> To the east side of the house is another slope, which is even greater than the one in the back. And it's wooded on that side, and it's currently a drainage anyway. So I don't think I'd want to put it in the drainage.

> The back side of the house is really the only place that would accommodate it, and that's where it was intended.

Larry Hyland, the owner of the company hired to construct the pool, admitted that an in-ground pool is an impervious surface because "water does not drain through the concrete." Mr. Hyland also recognized that the Commission has defined

---

6. Petitioners also sought permission to build a deck and patio in their variance request. The hearing officer denied the request for the pool, patio, and deck. The Board reversed the hearing officer and granted the application in all respects. Respondent sought only judicial review of the grant of the swimming pool aspect of the variance. The circuit court reversed the Board's grant of the pool variance and the Court of Special Appeals upheld the circuit court.

7. The record does not contain any evidence, other than this testimony, of the existence of such a covenant.

swimming pools as impervious. He testified that to construct the pool, his company would "actually cut into the slope and use a steel and reinforced concrete method." Finally, he noted that the pool could feasibly be constructed in the front yard or replace one of the parking structures on the west side of the home.

Daniel J. Werner, site engineer for the deck and pool projects, testified next. He, too, recognized the impervious nature of concrete swimming pools. He further testified that

the whole site is created.... It's completely cleared. It's sparse vegetation as far as grass and weeds.... And the soils around the house and in the disturbed area were changed during the construction of the house.

And the soils in this case are, I would classify them as probably sandy clay. They're very dense, relatively impervious.

Respondent then called Lisa Hoerger,[8] an environmental specialist with the Commission. She testified during examination by the Board that " 'reasonable use' has been interpreted as meaning primary residence. And a pool is an accessory structure or recreational amenity." Ms. Hoerger testified further that granting a variance in this case would confer to petitioners a "special privilege" within the Critical Area, which the variance law did not allow. Patricia Miley, a planner with the County Department of Planning and Code Enforcement, also testified that "[a] swimming pool is a recreational amenity, it's an accessory structure, and they are not permitted in the buffer." [9]

Two members of the Board signed the majority opinion which stated, in relevant part:

The Board finds that unique physical conditions exist on the property. This property is steeply sloped and wooded. The lot is also an irregularly shaped parcel with a pipestem

---

**8.** Ms. Hoerger's name incorrectly is spelled "Herger" in the transcript of the Board hearing.

**9.** If they were permitted, no variance would be necessary.

driveway located significantly within the expanded buffer to the critical area. The septic system consumes the bulk of the front yard which is the only flat area of the parcel. The location of the septic system forced construction of the existing residence towards the rear of the lot into the area of the steep slopes.... As a result of these unique physical conditions, there is no reasonable possibility of developing the lot *as proposed* without a variance to the Code requirements.

The testimony of one of the Petitioners indicates that the proposed swimming pool is small. The record reflects that several homes in the neighborhood have swimming pools. The proposed swimming pool would not be visible from most properties in the neighborhood due to the pipestem shape of the lot, the dense woods and its location to the rear of the house.... As a result, the Board concludes that the granting of a variance will not alter the essential character of the neighborhood or district in which the lot is located, will not substantially impair the appropriate use or development of adjacent property, and will not be detrimental to the public welfare.... Because the pool cannot be moved to the front of the property as a result of the septic system, restrictive covenants and tree cover and cannot be moved closer to the house because of the location of the deck access, the Board concludes that the variance granted is the minimum necessary to afford relief.

The property is located within the critical area, therefore, consideration of environmental impacts is essential. Because of the severe location restrictions ... and inability to place a pool in the rear yard, the Board concludes that the features of this property would cause a strict implementation of the critical area program to result in an unwarranted hardship. The Board finds that the swimming pool would not negatively impact the critical area because it acts as a catch basin for stormwater. Thus, the run-off on the steep slopes will be lessened and the slopes stabilized by the concrete. The water in the pool can freely evaporate and recharge the hydrology of the ecosystem, but will not cause

erosion and siltation into the critical area.... As a literal interpretation of the relevant COMAR and County Code provisions would prohibit the Petitioners from constructing ... a pool as their neighbors have, the Board concludes that such an interpretation would deprive the Petitioners of rights commonly enjoyed by other property owners in the area, and within the critical area. For the same reason, the granting of this variance will not confer on the Petitioners any special privilege that otherwise would be denied.

The lot conditions that cause the unwarranted hardship were not created by the Petitioners.[10] Therefore, the request for the variance is not based on conditions or circumstances that are the result of actions by the Petitioners. Likewise, the variance request does not arise from any condition relating to land or building use on any neighboring properties.

... [T]he Board concludes that the granting of this variance will not adversely affect water quality and will be in harmony with the general spirit and intent of the critical area program. Finally, testimony indicated that the pool will be constructed on an open lawn with mowed weeds and grass. Therefore, there is negligible habitat. Thus, the Board concludes that the proposed variance will not adversely affect fish, wildlife or plant habitat. [Emphasis added.]

A third member concurred fully with this opinion, but wrote separately. Two other members of the Board dissented.

Respondent sought judicial review in the Circuit Court for Anne Arundel County. That court reversed the Board for making "arbitrary and capricious" findings. The Court of Special Appeals affirmed. *White v. North,* 121 Md.App. 196, 708 A.2d 1093 (1998). We shall vacate the decisions of the Court of Special Appeals and circuit court and order that the

---

10. This is directly contrary to the undisputed evidence that petitioners increased the grade of part of the backyard from below 15% to 15% or above. This increase, however, was apparently part of an approved building project.

**44**

case be remanded for reconsideration pursuant to our opinions in this case and *Belvoir Farms*. Furthermore, in light of our resolution of this matter, it is unnecessary to address at this time whether the application of the zoning variance ordinance to petitioners' variance application constituted an unconstitutional taking of petitioners' property.

## III. Standard of Review

In judicial review of zoning matters, including special exceptions and variances, "the correct test to be applied is whether the issue before the administrative body is 'fairly debatable,' that is, whether its determination is based upon evidence from which reasonable persons could come to different conclusions." *Sembly v. County Bd. of Appeals*, 269 Md. 177, 182, 304 A.2d 814, 818 (1973). *See also Board of County Comm'rs v. Holbrook*, 314 Md. 210, 216–17, 550 A.2d 664, 668 (1988); *Prince George's County v. Meininger*, 264 Md. 148, 151, 285 A.2d 649, 651 (1972); *Zengerle v. Board of County Comm'rs*, 262 Md. 1, 17, 276 A.2d 646, 654 (1971); *Gerachis v. Montgomery County Bd. of Appeals*, 261 Md. 153, 156, 274 A.2d 379, 381 (1971). For its conclusion to be fairly debatable, the administrative agency overseeing the variance decision must have "substantial evidence" on the record supporting its decision. *See Mayor of Annapolis v. Annapolis Waterfront Co.*, 284 Md. 383, 395, 396 A.2d 1080, 1087 (1979); *Montgomery County v. Woodward & Lothrop, Inc.*, 280 Md. 686, 706, 376 A.2d 483, 495 (1977), *cert. denied sub nom. Funger v. Montgomery County*, 434 U.S. 1067, 98 S.Ct. 1245, 55 L.Ed.2d 769 (1978); *Agneslane, Inc. v. Lucas*, 247 Md. 612, 619, 233 A.2d 757, 761 (1967).

## IV. Discussion

The variance ordinance applicable to this case, County Code (1996), Article 3, section 2–107, states in relevant part:

(b) For a property located in the critical area, a variance to the requirements of the County critical area program may be granted after determining that:

(1) due to the features of a site or other circumstances other than financial considerations, strict implementation of the County's critical area program would result in an unwarranted hardship to the applicant; [11]

(2) a literal interpretation of the Code of Maryland Regulations, Title 27, Subtitle 01, Criteria for Local Critical Area Program Development, or the County critical area program and related ordinances will deprive the applicant of rights commonly enjoyed by other properties in similar areas within the critical area of the County;

(3) the granting of a variance will not confer on an applicant any special privilege that would be denied by COMAR, Title 27, Subtitle 01 or the County critical area program to other lands or structures within the County critical area;

(4) the variance request:

(i) is not based on conditions or circumstances that are the result of actions by the applicant; and

(ii) does not arise from any condition relating to land or building use, either permitted or non-conforming, on any neighboring property; and

(5) the granting of the variance:

(i) will not adversely affect water quality or adversely impact fish, wildlife, or plant habitat within the County's critical area; and

(ii) will be in harmony with the general spirit and intent of the County critical area program.

---

11. COMAR 27.01.11.01.A.(1) specifies that the variance requirements must provide, at a minimum, that "findings are made by the local jurisdiction which demonstrate that special conditions or circumstances exist that are *peculiar to the land or structure* within the jurisdiction's Critical Area program, [which] would result in unwarranted hardship." (Emphasis added.) The Anne Arundel County ordinance does not utilize the emphasized language of the regulation in subsection (b). The language of subsection (b), however, was approved by the Commission in 1993 when it required the County to eliminate the "practical difficulties" standard from its ordinance's provisions in respect to critical areas.

(c) A variance may not be granted under subsection (a) or (b) of this section unless the Board finds that:

(1) the variance is the minimum variance necessary to afford relief;

(2) the granting of the variance will not:

(i) alter the essential character of the neighborhood or district in which the lot is located;

(ii) substantially impair the appropriate use or development of adjacent property;

(iii) be contrary to acceptable clearing and replanting practices required for development in the critical area; or

(iv) be detrimental to the public welfare.

Petitioners must satisfy the requirements of subsection (b) and (c) because a critical area is involved. Accordingly, the "practical difficulty" standard is not applicable under Anne Arundel County's critical area variance procedures. Only the more stringent requirement of "unwarranted hardship" applies in the critical area, regardless of whether it is a yard or use variance.[12]

As is evident, with one exception, subsection (b) establishes an extensive list of requirements to be met. Subsection (c) imposes additional requirements. The exception in subsection (b) is that an applicant for a variance first must establish merely that "due to features of the site or other circumstances," an unwarranted hardship would result if the county's critical area program were strictly implemented. There is, as we view this ordinance, no requirement that the features of the site be "unique," or even considered, if "other circumstances" exist.

We noted in *Belvoir Farms*, 355 Md. at 266, 734 A.2d at 231, that subsection (b) was enacted in response to a Commission directive. We further noted that by the nature of its passage

---

12. We interpret the term "unwarranted hardship" of subsection (b) to be the equivalent of the "unnecessary hardship" standard generally used in zoning variance law. *See Belvoir Farms*, 355 Md. at 274–75, 734 A.2d at 236–37.

and its language, section 2–107(b) was intended to create substitute requirements for variances in the critical area. *Id.* at 266–67, 734 A.2d at 232. The legislative history of the St. Mary's County ordinance in *North,* 99 Md.App. at 512, 638 A.2d at 1180, is not apparent from the Court of Special Appeals' opinion, and may not have been presented to that court. The ordinance in that case and the case *sub judice* differ in structure and content. The regular variance requirements and the critical area requirements in the St. Mary's County ordinance are in separate sections that appear to have been enacted together. If so, that contrasts with the amendment process in respect to Anne Arundel County's ordinance. Moreover, in the St. Mary's County ordinance, the drafters specifically retained the general "uniqueness" requirement for variances in the critical area:

> (1) In granting variances the Board of Appeals must find:

> (a) That special conditions or circumstances exist *that are peculiar to the land or structure involved* and that a literal enforcement of the provisions of the Critical Area program would result in unwarranted hardship.... [Emphasis added.]

Section 38.2(7)(a) of the St. Mary's County Zoning Ordinance (1998).[13]

The comparable section of the County Code, section 2–107 provides in relevant part:

> (b) ... [A] variance to the requirements of the County critical area program may be granted after determining that:

>> (1) *due to the features of a site or other circumstances* ... strict implementation of the County's critical area program would result in an unwarranted hardship.... [Emphasis added.]

---

13. This is the most recent version of the St. Mary's County ordinance we have available. It has changed since *North,* but the changes appear to be cosmetic, not substantive.

In Anne Arundel County, the general "uniqueness" requirement for variances in the critical area effectively has been eliminated. Not only has the term, or any of its synonyms, been omitted, but "other circumstances" almost always will exist, as they do in this case. Accordingly, in most instances under this particular ordinance, the "unwarranted hardship" standard may be the only prong of the variance consideration. The other factors listed in subsections 2–107(b) and (c) are utilized in making the determination of whether an unwarranted hardship exists.

■ With the clarification of the unwarranted hardship standard made in *Belvoir Farms,* the issue now is whether petitioners presented substantial evidence in respect to that unwarranted hardship standard, i.e., whether the denial of their request to build a swimming pool is a denial of a reasonable and significant use. *See Belvoir Farms,* 355 Md. at 282, 734 A.2d at 240. We note, as we did in *Aspen Hill Venture v. Montgomery County Council,* 265 Md. 303, 313–14, 289 A.2d 303, 308 (1972), that

we must not forget the underlying principle that, "Such ordinances [zoning ordinances] are in derogation of the common law right to so use private property as to realize its highest utility, and while they should be liberally construed to accomplish their plain purpose and intent, they should not be extended by implication to cases not clearly within the scope of the purpose and intent manifest in their language." *Landay v. Board of Zoning Appeals,* 173 Md. 460, 466, 196 A. 293 (1938). [Alteration in original.]

In *Landay,* 173 Md. at 465, 196 A. at 295–96, we noted that "[i]n a constitutional sense, the only justification for the restrictions ... on the use of private property is the protection of the public health, safety, or morals." (Citations omitted.) *See also Gino's of Maryland, Inc. v. Mayor of Baltimore,* 250 Md. 621, 642, 244 A.2d 218, 230 (1968) ("[Z]oning ordinances are in derogation of the common law and should be strictly construed"); *County Comm'rs v. Zent,* 86 Md.App. 745, 751, 587 A.2d 1205, 1208 (1991); *Lone v. Montgomery County,* 85 Md.App. 477, 494–95, 584 A.2d 142, 150–51 (1991). *Cf. Cana-*

*da's Tavern, Inc. v. Town of Glen Echo,* 260 Md. 206, 218, 271 A.2d 664, 670 (1970) (Barnes, J., dissenting); *Norwood Heights Improvement Ass'n v. Mayor of Baltimore,* 191 Md. 155, 163–64, 60 A.2d 192, 196 (1948) (Henderson, J., dissenting).

In light of our holding in *Belvoir Farms* that an unwarranted hardship can result from the denial of a reasonable and significant use, we shall direct that this case be remanded to the Board for reconsideration in light of the standard we explained in *Belvoir Farms.*

*North,* 99 Md.App. 502, 638 A.2d 1175, a Court of Special Appeals opinion involving a similar zoning variance ordinance authorized by the Critical Area Program, was decided prior to the clarification in *Belvoir Farms* which, as applied by the Court of Special Appeals in that case, was the essential equivalent of an unconstitutional regulatory taking, a standard we rejected in *Belvoir Farms.* The Court of Special Appeals, in interpreting the St. Mary's County critical area zoning variance ordinance, which resembled the ordinance in this case (except for its more restrictive requirements that the property be unique), focused, in part, on the requirement that the applicant prove an unwarranted hardship had resulted from the loss of all economic use, instead of a denial of a reasonable and significant use.

Prior to *Belvoir Farms,* we had not, with the exception of references to unconstitutional takings, defined the terms unwarranted hardship, unnecessary hardship, and the like, other than the use of the terms themselves. We have made clear in *Belvoir Farms* that it is a lesser standard than that applicable in unconstitutional taking cases. In a given case, whether a property owner is being denied a reasonable and significant use initially will be a determination of the zoning agency, which we presume possesses the necessary expertise to decide what is reasonable and significant. *See, e.g., Annapolis Waterfront Co.,* 284 Md. at 395, 396 A.2d at 1087 (noting that judicial review of administrative decisions is narrow be-

cause board members generally have expertise in the matter at hand and should be free to exercise their discretion).

As long as evidence exists before the agency that would make its factual determination as to reasonableness and significance fairly debatable, its determination ordinarily should be upheld. *See supra* Part III. Generally, it is only when an agency's factual determinations are unsupported by substantial evidence that the courts may vacate an otherwise proper agency decision.

The variance provisions of the ordinance at issue include, as do most such ordinances, a list of other factors that must be considered with respect to the grant or denial of a variance. They are described as (1) a deprivation of rights commonly enjoyed by others; (2) that no special privilege will be conferred on an applicant; (3) that the need for relief not be caused by an applicant's own acts; (4) the need for a variance does not arise from conditions on adjacent property; (5) a variance will not adversely affect water quality, fish, wildlife, or plant habitat; (6) a variance will be in harmony with the general spirit of the particular zoning regulation; (7) that the variance is the minimal necessary to afford relief; (8) the variance will not alter the essential character of a neighborhood; (9) the variance will not impair an appropriate use of adjacent property; (10) the variance will not counter acceptable clearing and replanting requirements; and (11) the variance will not be detrimental to the public welfare. If total compliance with every specific requirement were necessary, relief would be nearly impossible and serious "taking" questions might arise. It is our view that these specifically stated requirements are to be considered in the context of the entire variance ordinance, to the end that, when interpreted as a whole, either they are or are not *generally* met.

Moreover, the essential determination is whether an unwarranted hardship exists. The specific factors that must be considered cannot be construed individually to overrule a finding of unwarranted hardship any more than they could overrule a finding of an unconstitutional taking of one's

property. The individual provisions that must be considered are part of the entire matrix that defines what information is necessary to reach a finding as to the existence or nonexistence of an unwarranted hardship.

On remand, the Board shall reconsider the application in light of the standard established in *Belvoir Farms*. Because of the necessity of a remand for reconsideration in light of *Belvoir Farms*, we shall not address the Board's prior findings, and the circuit court's review of those findings, except to note two instances in which our guidance may be helpful.

The Board, in part, found: "As a literal interpretation of the relevant [critical area] provisions would prohibit the Petitioners from constructing . . . a pool as their neighbors have, the Board concludes that such an interpretation would deprive the Petitioners of rights commonly enjoyed by other property owners in the area, and within the critical area." The lower court disagreed, saying:

> If the Court adopted the Board's interpretation that rights of an applicant should be compared to those enjoyed by land owners prior to the Program, this provision of the law would be meaningless. . . .
>
> Rather, the Court finds that the rights of an applicant for a variance must be compared to the rights enjoyed by others under the Program.

The Court of Special Appeals appears to have assumed that the trial court's position was correct, and then held, as we read its opinion, that the record was silent as to any pool variances granted to nearby properties in the critical area after the imposition of critical area controls. *See White,* 121 Md.App. at 234, 708 A.2d at 1112.

■ We perceive both courts below to be incorrect. Their position is that in order to determine whether a grant of a variance would confer a right commonly enjoyed by others, the Board may consider only uses resulting under the critical area variance procedures for Anne Arundel County. We disagree. That position would defeat the variance provisions in their entirety. The first variance under the critical area

variance procedure could never be granted simply because it was the first. It then would follow that none could be granted. That cannot be the intent of the provision.

The more plausible interpretation is that such provisions relate to the existing uses, whether permitted as of right under the general ordinance or whether they resulted from other variance grants, or are legal nonconforming uses, or were established in any other proper manner. That was the position of the Board, which we perceive to be correct. We also agree with the Board that "[f]or the same reason, the granting of this variance [would] not confer . . . any special privilege" when viewed in comparison to *all* similar uses in the neighboring area.

## V. Conclusion

For the reasons we have stated, we shall vacate the decision of the Court of Special Appeals and direct that the case be remanded to the Board of Appeals of Anne Arundel County for further proceedings consistent with this opinion and *Belvoir Farms.*

**JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO VACATE THE JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AND REMAND THE CASE TO THE CIRCUIT COURT WITH DIRECTIONS TO VACATE THE DECISION OF THE BOARD OF APPEALS OF ANNE ARUNDEL COUNTY AND REMAND THE CASE TO THE BOARD OF APPEALS FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION AND *BELVOIR FARMS HOMEOWNERS ASS'N, INC. V. NORTH,* 355 MD. 259, 734 A.2D 227 (1999); COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.**