999 A.2d 956

Sara CALDES, et al.

v.

ELM STREET DEVELOPMENT, et al.

No. 12, Sept. Term, 2008.

Court of Appeals of Maryland.

July 22, 2010.

Michael R. McCann (Michael R. McCann, P.A. of Towson, MD), on brief, for petitioners.

Kurt J. Fischer (Melissa L. Mackiewicz of DLA Piper US LLP of Baltimore, MD; Harry C. Blumenthal and Eileen E. Powers of Blumenthal, Delavan & Williams, P.A. of Annapolis, MD), on brief, for respondents.

James A. Chance, Asst. County Atty. (Jonathan A. Hodgson, County Atty., of Annapolis, MD), on brief, for respondents.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, BARBERA and JOHN C. ELDRIDGE, (Retired, Specially Assigned), JJ.

MURPHY, J.

On March 6, 2006, the County Board of Appeals of Anne Arundel County (the Board) entered an ORDER that included the following provisions:

1. [Respondent Elm Street Development's petition for] [a] variance to the density requirements for development within the [Resource Conservation Area] of the [Chesapeake Bay] Critical Area to permit seven lots on 23 ± acres [with a street address of 481 Epping Forest Road, near Annapolis] is hereby **GRANTED;** and

2. Variances to permit the construction of dwellings, a road and associated facilities with disturbance to the expanded buffer and steep slopes and to permit forest clearing as well as variances to extend the time (from 1 year to 3 years) to obtain permits, and (from 2 years to 6 years) to complete construction are hereby **GRANTED,** subject to the following conditions:

 (a) No more than seven (7) houses are permitted on the property.

 (b) Only one lot can be cleared at any given time. The lot must be stabilized with vegetation before any subsequent lots can be cleared.

(c) No vegetation shall be disturbed beyond the expanded buffer line, unless such disturbance is necessary to remedy a septic system issue.

(d) Each lot must have a "rain garden" or similar on-site stormwater management system to provide quantity and quality control for all impervious surfaces thereon.

(e) The configuration of the lots as shown on the site plan (Petitioner's Exhibits 4 and 15) shall not be modified.

(f) The homes on Lots 1 and 7 shall not exceed the current footprint.

(g) The homes on Lots 2, 3, 4, and 6 must be placed at the minimum building restriction line nearest to the street.

(h) The home on Lot 5 must be placed at the minimum building restriction line nearest to Lot 4.

(i) Any area disturbed to permit the construction of the access road must be stabilized with a covering of mulch or similar approved stabilization method at all times and stages of construction.

(j) If any of the conditions are violated, this decision reverts to a DENIAL of all the requested variances.

The Board's Order was accompanied by a twenty-three page "MEMORANDUM OF OPINION," a three page Concurring Opinion and a nine page "DISSENT." Petitioner Sara Caldes, along with other "protestants" in the proceeding before the Board, sought judicial review of the Board's Order, which was affirmed by the Circuit Court for Anne Arundel County.[1] After the judgment of the Circuit Court was affirmed by the Court of Special Appeals,[2] the Petitioners

---

1. The Circuit Court's Memorandum Opinion was filed on February 21, 2007.

2. *Caldes v. Elm Street Dev.*, No. 79, September Term, 2007, filed January 17, 2008.

requested that this Court issue a writ of certiorari to resolve the following issues:

(1) Does Anne Arundel County's lot merger law (requiring nonconforming substandard lots to be merged so as to approximate current county density limitations) override the density limitations in State and County critical area law?

(2) Does the grandfathering provision in COMAR 27.01.02.07 B allow the subject property to be developed in accordance with the density limitations applicable prior to the adoption of the critical area law?

(3) Even assuming the lot merger law supplants the density limitations in State and County critical area law, can a developer rely upon nonconforming substandard lots in an old plat when that plan was abandoned and lots were subsequently sold in complete disregard of that plat?

(4) Can a developer meet the standard for obtaining a variance in the critical area, and overcome the statutory presumption against development in the critical area, by simply showing that he could hypothetically develop the property in a manner that would have a greater environmental impact?

We granted their petition. *Caldes v. Elm Street,* 404 Md. 658, 948 A.2d 70 (2008). For the reasons that follow, we shall affirm the judgment of the Court of Special Appeals.

## Background

The opinion of the Court of Special Appeals includes the following factual summary:

The Elm Street property that is the subject of this litigation consists of 22.196 acres on Epping Forest Road near Annapolis. The property was originally part of a subdivision known as "Epping Forest Section B." The plat for Epping Forest was recorded in the Anne Arundel County land records in 1926. The 1926 plat showed that the tract was at that time subdivided into approximately 500 small lots. [Today, t]he Elm Street property . . . embraces

150 of the roughly 500 lots shown on the 1926 plat. The original owners of the Epping Forest tract had been Severn Shores, Inc[.]. Seve[r]n Shores, however, defaulted on its mortgage in 1930. Except for five small lots that had been sold out of the original subdivision in 1928 and 1929, the remainder of the property was sold to six separate purchasers. The successors to two of those 1930 purchasers were 1) James L. Smith and 2) Charles A. and Renate I. Miller. Elm Street is now the owner of what had been the Smith property and the Miller property, in all[,] approximately 30% of the original Epping Forest Section B subdivision.

In the years since the 150 lots were recorded in 1926, two pertinent sets of restrictions have been imposed upon the development of the property. The first set of restrictions came in 1952 with the adoption by Anne Arundel County of its first land use regulations, including a zoning code. The Elm Street property is now zoned R1–Residential. In an R1–Residential District, the minimum lot size for the building of a residence is 40,000 square feet [ (approximately one acre) ]. As a straight arithmetic calculation, the Elm Street property—the original 150 lots on the 1926 plat—can only accommodate 12 lots of sufficient size to permit the building of a residence [in the R1–Residential District].

The second set of restrictions [imposed upon the development of the property] came with the enactment by the Maryland General Assembly in 1984 (by ch. 794 of the Acts of 1984) of the Chesapeake Bay Critical Area Protection Program. Its provisions are now codified in Maryland Code, Natural Resources Article, §§ 8–1801 through 8–1817. Section 8–1808(a) provides:

> (a) *Local jurisdictions to implement; grants.*—(1) It is the intent of this subtitle that each local jurisdiction shall have primary responsibility for developing and implementing a program, subject to review and approval by the Commission.

* * *

With respect to the Critical Area Program, we observed in *Becker v. Anne Arundel County,* 174 Md.App. 114, 130, 920 A.2d 1118 (2007):

> The State Critical Area Program provides that its purpose is to establish a resource protection program for the Chesapeake and Atlantic Coastal Bays and their tributaries. Maryland Code (2000 Repl.Vol. & Supps. 2002–2006), § 8–1801(b)(1) of the Natural Resources Article ("N.R."). *The program was implemented "on a cooperative basis between the State and affected local governments, with local governments establishing and implementing their programs* in a consistent and uniform manner subject to State criteria and oversight." N.R. § 8–1801(b)(2).

(Emphasis supplied). See also *Lewis v. Department of Natural Resources,* 377 Md. 382, 391–94, 833 A.2d 563 (2003); *White v. North,* 356 Md. 31, 36–38, 736 A.2d 1072 (1999) ("Section 8–1808(a)(1) requires local governments to have primary responsibility for development of programs to regulate land use in the critical area, 'subject to review and approval by the Commission.' ").

By 1988, Anne Arundel County had developed its implementing program for the parts of the Chesapeake Bay Critical Area lying within its boundaries with the enactment of Anne Arundel County Code (1985, as amended), Article 28, §§ 1A–102 through 1A–112. The Elm Street property in this case lies within the Critical Area generally and, more specifically, within the "Resource Conservation Area" ("RCA"), the most restrictive of the three land use categories in the Critical Area Program. Of particular pertinence to this case is County Code, Article 28, § 1–A–103(d)(2), which provides:

> [T]he maximum permitted density in a resource conservation area [RCA] is not more than one dwelling unit per 20 acres.

*Caldes v. Elm Street Dev.,* No. 79, September Term, 2007, unreported opinion filed January 17, 2008, pp. 1–3.

The Board's majority opinion included the following findings and conclusions:

This property comprises approximately 23 acres of land on Saltworks Creek within the R1 zone and designated as Resource Conservation Area ("RCA") in the Critical Area. The Petitioner contends that there are 12 lawful building sites (and we agree) on the property and purposes to resubdivide (at a later time) the property into seven lots. This property is significantly impacted by steep slopes, Critical Area buffer and expanded buffer, none of which can be disturbed under the County's Critical Area Program, Title 1A of the Zoning Regulations. Less than four acres of the property would be disturbed under this development plan.

The [Respondent] has requested a variance (BA 86–04V) to exceed the permitted maximum density (one dwelling unit/20 acres) on property within the RCA of the Critical Area (the "density variance"). The [Respondent] has also requested variances to permit the construction of dwellings, a road and associated facilities with disturbance to the expanded buffer and steep slopes and to permit forest clearing as well as a variance to extend the time (from 1 year to 3 years) to obtain permits, and (from 2 years to 6 years) to complete construction of a residential subdivision (BA 6–04V) (the "infrastructure variances").

The [Respondent]'s request to reduce the number of lots on site from 12 to seven appears to follow the tongue in cheek saying, "no good deed goes unpunished". This proposal has met with harsh opposition from some residents and support from Critical Area Commission and the Office of Planning and Zoning. Even amongst the supporters of the project[,] there is squabbling over whether a variance to the density criteria of Article 28, § 1A–103(d)(2), which permits only one dwelling unit for each 20 acres of RCA property, is necessary.

This property contains only 23 acres, all within the RCA. Therefore, only one dwelling unit would be permitted if this property had not been previously subdivided. This proper-

ty was originally part of the Epping Forest Subdivision plat. The current development of Epping Forest is a charming community, well known for its waterfront cottage ambiance as well as for steep slopes, small lots and narrow streets. This property, along with Epping Forest proper, is nonconforming by today's standards as it was subdivided in the 1920's—long before the adoption of the first County land use regulations in 1952. Given this nonconforming scenario, this Board has heard many variance requests for development and redevelopment in this vicinity.

While it appeals to our sense of economy to dispense with this request by simply denying (as did the Administrative Hearing Officer) the request for a density variance, we feel that the variance deserves careful consideration. The [Respondent] desires to reduce the amount of density within the RCA from that permitted by required lot consolidation here. However, the [Respondent] argues that a variance is not necessary (notwithstanding the argument to the contrary, the [Respondent] has requested one). The Critical Area Commission strongly asserts that no such variance is necessary and a variance to the Critical Area criteria should be granted only when an urgent need exists. The Commission contends that the reduction in density does not require relief and the precedence of requiring such a variance should not be established. However, we are convinced from our review of the law that the density variance request should be acted upon and granted to permit seven dwellings on this 23 ± acre parcel within the RCA.

\* \* \*

Development within the Chesapeake Bay Critical Area, being that area within 1,000 feet of the Chesapeake Bay and its tributaries, has been the subject of much legislative effort and protection by the General Assembly. Despite several court decisions that sought to lessen the power of the Critical Area Regulations, the General Assembly responded directly to these court decisions and in each case has subsequently strengthened the Critical Area Regulations. The current Critical Area variance criteria are very

strict. The statute requires the Board to presume that the requested development activity does not conform to the general purpose and intent of the Critical Area Program. *See,* Maryland Annotated Code, Natural Resource Article, Section 8–1802(d)(2)(i). Additionally, "unwarranted hardship" is defined as "without a variance, an applicant would be denied a reasonable and significant use of the *entire* parcel or lot for which the variance is requested.["] *Emphasis added.* To qualify for a variance to the Critical Area criteria, an applicant must meet each and every one of the variance provisions. *See, id.,* Section 8–1808(d)(4)(ii). An applicant must also prove that if the variance were denied, the applicant would be deprived of a use or structure permitted to others in accordance with the Critical Area Program. *See, id.,* Section 8–1808(d)(4)(iii). Given these provisions of the State criteria for the grant of a variance, the burden on an applicant seeking a variance is very high.

The State statute requires that local jurisdictions adopt a program to protect the Critical Area. Anne Arundel County's local Critical Area variance program contains 12 separate criteria. *See,* Code, Article 3, Board of appeals, Section 2–107. Each of these individual criteria must be met. If the applicant fails to meet just *one* of these 12 criteria, the variance is *required* to be denied. Securing the grant of a variance to the Critical Area criteria is not an easy trick—nor should it be.

The property that is the subject of these appeals is a parcel within the RCA of the Critical Area. This property is a waterfront site and contains steep slopes (lots of them) and forest. The applicant requests variances to increase the density within the RCA to seven total lots on this parcel and to build the road and infrastructure (stormwater management and septic systems). The steep slopes, tidal waters adjacent to the property and the required buffers thereto further impact development. Only a small amount of land along the roadway is outside the steep slopes (See, [Respondent]'s Exhibit 5). Any access to the "donut hole" of flatter land in the center of the site would require impact

to the steep slopes. The location of the steep slopes alone would also prevent access to the "Smith lots" without the grant of a variance. These physical characteristics and the actions of the regulations limit the development potential of the site such that variances are required to use the 12 lawful (now seven requested) lots. Without variances, we are convinced that the property could not be developed with residences on the 12 permitted lots or on the seven proposed lots, for which the density variance is requested; and, therefore, there is no question that the [Respondent] would suffer an unwarranted hardship if some variances were not granted. *See, id.,* Section 2–107(b)(1).

We find that it is exactly the unique physical conditions of the site (topo, trees and tidal waters) that require a variance to the density criteria also. If the density variance is not granted, the [Respondent] can build 12 homes, but there will be a much high negative impact to the environment. This high negative impact would result in not only an unwarranted hardship to the applicant but to the public's welfare, in contravention of Section 2–107(c)(2)(iv).

The [Respondent] has shown that the variances requested are the minimum variance necessary to afford relief to the applicant. *See, id.,* Section 2–107(c)(1). In White, Belvoir Farms, et al., the Court of Appeals established that, despite a profound public interest in preserving and protecting the Chesapeake Bay, property owners would, in all cases, retain an absolute right to the 'reasonable and significant use of their property.['] The Court's decisions required that administrative agencies should err on the side of property owners. The decisions further examined the concept of 'minimum necessary' and determined that the statutory language should be considered in the context of adhering to the 'reasonable and significant use' standard. With this in mind we find it inconceivable that a development plan that provides for five fewer lots than otherwise permitted, one loop road (at the minimum permitted by County standards), one stormwater outfall and only *replacement* septic systems

impacting the buffer that this is not the minimum intrusion into the Critical Area.

The [Respondent]'s request for infrastructure variances would permit the development of seven lots. To ensure that the facts considered by the Board in rendering this decision are not modified, we will impose several conditions on the [Respondent]. The Board will condition the grant of these variances on the development of no more than seven homes on this property. All impervious surfaces associated with those homes, can (and must) be located outside of the buffer and expanded buffer under this plan. This proposal is the minimum when contrasted with the "current" 12 lot development potential. The currently available development contains lots with shapes similar to gerrymandered legislative districts, accessible only by more numerous streets that would impact more steep slopes, more forest and more land within the RCA. We fail to see how more impacts to the sensitive features of this site would be better.

The one loop road with reconfigured lots with homesites in the so-called "donut hole" of the road out of the waterfront area and several waterfront lots of sufficient size to permit the residences on the flatter portions of the site and outside of the protected buffer areas is the best development plan for this property in our humble, factual analysis. We feel obligated, however, to impose several conditions to ensure that the development plan represents the minimum variances necessary. If any of our imposed conditions are violated or sought to be varied in the future, we would revoke this approval. It is with that warning that we grant these variances and impose conditions.

\* \* \*

The [Respondent] appears honest and forthright and we do not mean to disparage the applicant in any way. However, to ensure that the Protestants and other area residents are not unpleasantly surprised in the future (and they certainly seem concerned that they and we will be the victims of a bait and switch scheme), we will condition the grant of the requested variances on the exact compliance

with the site plan as submitted. No changes to the lot layout or infrastructure routes are permitted. If the [Respondent] cries foul at such a condition, we find that the [Respondent] should have been fully prepared to present its plan at the time of the hearing. If it now finds that its plans were inaccurate, the [Respondent] must live with any mistakes. The Board has based its factual determinations faithfully on these plans. With no permitted revisions to the lot layout and infrastructure location, the Board can rely fully on the evidence presented and no unintended (by this Board) result will occur.

These variance requests are not the result of actions by the [Respondent] nor do they arise from conditions relating to land use on neighboring properties. *See, id.,* Section 2–107(b)(4)(i) and (ii). The variance requests are directly related to the topographic and site conditions of this property. But for its location adjacent to the water and the steep slopes on site, this property owner would not need to seek the variances.

\* \* \*

It is rare, in this Board's experience, that a [Respondent] comes before this body to argue for a self-imposed limitation to its existing property rights. It is rarer still that the [Respondent] seem to have arrived at this position through largely altruistic reflection. As the instant case consolidates BA 6–04V and BA 86–04V, the Board has held this case open for nearly 16 months during the evidentiary phase in order to allow both the Protestants and the [Respondent] sufficient opportunity to present their cases in main. From this voluminous evidence and during the extensive oral testimony, one undeniable impression emerged; to wit, the [Respondent] has consistently elected the least intrusive, most conservative development option available. Not only does the [Respondent]'s plan substantially reduce the number of lots to be developed (from 12 legal lots to seven proposed building sites) but it thoughtfully situates the development away from the most sensitive and fragile areas. Additionally, the [Respondent] has presented a series of

commonsense conditions that further bind their future actions. While these, and other, conditions may well have been imposed by the Board regardless of the [Respondent]'s suggestion, we find it heartening and telling that the party with the greatest interest in maximizing its flexibility would voluntarily adopt such restrictions. Such good faith is unique and refreshing when encountered. Nothing in either [Respondent]'s or Protestants' evidence dissuades us from accepting this impression as honest and forthright. We further find that the [Respondent]'s variance requests now before the Board are consistent with both the [Respondent]'s use by right and their readily apparent desire to realize a conscientious outcome to their development intent.

As stated above, the Circuit Court affirmed the decision of the Board, and the Court of Special Appeals affirmed the judgment of the Circuit Court.

## Discussion

### I. & II.

■ Petitioners first argue that, as a matter of law, only one dwelling can be constructed on the property. In the words of Petitioners' brief:

Lest there be any doubt regarding the supremacy of the critical area program and its density limitations, ... [Anne Arundel] County's critical area law provides:

§ 1A–112. Conflict with other law.

Unless pre-empted or otherwise provided by federal or State law, whenever *a provision of this title* or any element of the County critical area program *and any other provision of law* ... impose contradictory requirements covering the same subject matter, the provision that is more protective of the environment or imposes higher standards of environmental protection or enhancement shall govern.

County Code, Art. 28, § 1A–112 (emphasis added). The density limitation of one dwelling per 20 acres in the State's critical area law (COMAR 27.01.02.05 C(4)) and in the

County's critical area law (Art. 28, § 1A–103(d)(2)) is clearly "contradictory" to the 40,000 square foot minimum area in R1 zoning district (Art. 28, § 2–304). The former control because they are more protective of the environment and impose higher standards of environmental protection and enhancement.

(Emphasis added in brief). The "otherwise provided" exception to § 1A–112 makes this statute inapplicable to the case at bar, which involves "grandfathered" lots. It is clear from the legislative and regulatory history of the State and local critical area provisions that certain parcels of land within a Resource Conservation Area are exempt from the "density provisions"— but from no other provisions—of the critical area laws. The legislative history includes a twenty-four page "Explanation of 'Grandfathering' in Relation to the Proposed Chesapeake Bay Critical Area Criteria," dated October 29, 1995, prepared for the Joint Oversight Committee of the General Assembly by Assistant Attorney General Thomas A. Deming, Counsel to the Department of Natural Resources, in which Mr. Deming states:

.... The Commission's task, beyond simply acknowledging the concepts of nonconforming use and vested rights, has been to determine the extent to which property owners' pre-existing expectations can be honored without jeopardizing attainment of goals of the Critical Areas legislation.

The Commission was informed that a considerable amount of presently undeveloped land in the Critical Area consists of single lots or parcels, held by individuals with the expectation of eventually building homes. Additional undeveloped land in the Critical Area has been subdivided and recorded, although lots have not been sold nor buildings developed. Much of these two types of land would be classed [by the local jurisdiction] in a Resource Conservation Area, and[,] upon program approval[,] will be subject to the development limitation that residential use may not occur at a density greater than one dwelling unit per 20 acres. The Commission decided that[,] even if an individually owned, undeveloped lot or parcel in the Resource

Conservation Area is less than 20 acres in area, the owner should be permitted to build one dwelling unit on it while complying with provisions of the criteria other than density limitations. However, land that is merely subdivided "on paper" will be brought into conformance with all of the criteria, including the density limitation, insofar as possible. In striving for an equitable balance between reasonable private expectations and the achievement of the public goals of the law, the Commission felt that the protections that would be achieved down the line could justify this one-time departure from the policies behind the one in 20 acre density provision for single lots or parcels. However, where "paper" subdivisions can be brought into conformance with the criteria, they should be.

As noted in a law review article co-authored by the Honorable Solomon Liss, the first Chair of the Chesapeake Bay Critical Areas Commission (the Commission):

The Chesapeake Bay Critical Area Protection Program was the most controversial of the laws enacted in 1984 to address the restoration of Maryland's most significant natural resource. This legislation created a Chesapeake Bay Critical Areas Commission (Commission) and authorized the Commission to adopt regulations that establish a resource protection program for the Bay and its tributaries. . . . Each county, or a municipal corporation with planning and zoning powers, in which any part of the Critical Area is located, is responsible for developing and implementing a local program of resource protection in accordance with the Commission's regulations. The program of each local jurisdiction will be subject to review and approval by the Commission.

. . . . The most controversial aspect of the criteria is the regulation that limits development in the Resource Conservation Area, one of the three classifications for land use around the Bay, to a density of one dwelling unit per twenty acres.

Solomon Liss & Lee R. Epstein, *The Chesapeake Bay Critical Area Commission Regulations: Process of Enactment and*

*Effect on Private Property Interests,* 16 U. Balt. L.Rev. 54, 54–55 (1986). In this article, the authors expressly state that, "[t]he Commission's criteria provide for ... 'grandfathering' of certain lands and development[.]" *Id.* at 79.

The statute that established the Commission provided that "the criteria promulgated by the Commission under Natural Resources Article ... may not be implemented unless the General Assembly at the 1986 Session affirms by joint resolution that the criteria are reasonable and acceptable to accomplish the goals of this subtitle." The criteria promulgated by the Commission included proposed COMAR 14.15.02.07, which, in pertinent part, provided:

.07 Grandfathering.

A. After program approval, local jurisdictions shall permit the continuation, but not necessarily the intensification or expansion, of any use in existence on the date of program approval, unless the use has been abandoned for more than 1 year or is otherwise restricted by existing local ordinances. If any existing use does not conform with the provisions of a local program, its intensification or expansion may be permitted only in accordance with the variance procedures outlined in COMAR 14.15.11.

B. Local jurisdictions shall establish grandfather provisions as part of their local Critical Area Programs. Except as otherwise provided, local jurisdictions shall permit the types of land described in the following subsections to be developed in accordance with density requirements in effect prior to the adoption of the local Critical Area Program notwithstanding the density provisions of this chapter. A local jurisdiction shall permit a single lot or parcel of land that was legally of record on the date of program approval to be developed with a single family dwelling, if a dwelling is not already placed there, notwithstanding that such development may be inconsistent with the density provisions of the approved local program.

\* \* \*

(2) Any legal parcel of land, not being part of a recorded or approved subdivision, that was recorded as of December 1, 1985, and land that was subdivided into recorded, legally buildable lots, where the subdivision received the local jurisdiction's final approval prior to June 1, 1984, provided that:

(a) The local jurisdiction develops as part of its program, procedures to bring these lands into conformance with the local Critical Area Program insofar as possible, including the consolidation or reconfiguration of lots not individually owned, and these procedures are approved by the Commission, or

(b) If any such land has received a building permit subsequent to December 1, 1985 but prior to local program approval, and is located in a Resource Conservation Area, that land shall be counted by the local jurisdiction against the growth increment permitted in that area under COMAR 14.15.02.06, unless the Commission determines at the time of program approval that steps had been taken to conform the development to the criteria in this subtitle insofar as possible;

\*　　\*　　\*

(4) Land that was subdivided into recorded, legally buildable lots, where the subdivision received the local jurisdiction's final approval after December 1, 1985, provided that either development of any such land conforms to the criteria in this subtitle, or the area of the land is counted by the local jurisdiction against the growth increment permitted under COMAR 14.15.02.06.

C. For purposes of implementing this regulation, a local jurisdiction shall have determined, based on land uses and development in existence on December 1, 1985, which land areas fall within the three types of development areas described in COMAR 14.15.02.

D. Nothing in this regulation may be interpreted as altering any requirements for development activities set out in COMAR 14.15.03 and 14.15.09 of this subtitle

12 Md. Reg. 2353 (Nov. 22, 1985) (citing 12 Md. Reg. 1964–65 (Sept. 27, 1985)). This provision, which was "affirmed" by the General Assembly in Joint Resolutions signed on May 13, 1986, is presently located in COMAR 27.01.02.07.

The Commission's records include copies of correspondence between Anne Arundel County authorities and the Commission that led to final approval of the Anne Arundel County Critical Area Program, which would not have been approved unless it included grandfather provisions required by the Commission. The Commission's records also include "A SUMMARY OF THE CHESAPEAKE BAY CRITICAL AREA COMMISSION'S CRITERIA AND PROGRAM DEVELOPMENT ACTIVITIES 1984–1988," prepared by J. Kevin Sullivan in August of 1989. In Appendix B to that document, Mr. Sullivan reports that the Commission approved Anne Arundel County's Critical Area Program on October 5, 1988.

Petitioners nonetheless argue that there are two additional reasons why COMAR's "grandfathering" provision is inapplicable: (1) Anne Arundel County has never adopted any grandfathering provision as part of its Critical Area Program, and (2) the property at issue was never subdivided into "legally buildable lots." There is no merit in any of these arguments.

Anne Arundel County has adopted grandfathering provisions that are applicable to the property at issue.[3] On October 24, 1986, Anne Arundel County enacted what has become known as the "Antiquated Lots Law." (Laws of Anne Arundel County B38–86 (1986)). That ordinance, then codified in Article 28, § 2–101 of the Anne Arundel County Code, in pertinent part, provided:

(c) Except for lots served by public water and sewer, a residential dwelling may not be constructed on a properly recorded lot that was in the same ownership as one or more

---

3. We reject the argument that, to establish grandfather provisions required by the Commission the local jurisdiction must enact an ordinance that includes the words "grandfather" and/or "grandfathering."

adjacent unimproved lots on January 1, 1987, if a building permit has not been applied for by January 1, 1987, unless the adjacent lots are combined to meet or come as close as possible to meeting the area requirements for the residential district in which the lot is located.

■ Section 2–101 was repealed on August 11, 2003, when Anne Arundel County enacted what has become known as the "Lot Merger Law," an ordinance "to provide an orderly process for the merger of lots in residential communities that protects the lot owners, subsequent purchase of the lots, owners of other lots in the communities and the Chesapeake Bay critical area[.]" (Laws of Anne Arundel County B37–03 (2003)). That ordinance, then codified in Article 28, § 2–1A–04 of the Anne Arundel County Code (and now codified in § 18–4–202 of that code), in pertinent part, provides:

§ 2–1A–04. **Use and merger of lots of substandard area or dimensions.**

(a) Except as provided in subsection (b) of this section, a dwelling may be constructed on a lot that does not comply with the minimum area or dimensional requirements of the zoning district in which the lot is located, provided that the lot complied with applicable minimum area and dimensional requirements, if any, at the time it was created.

(b) Except as provided in subsection (c) of this section, a lot that does not comply with the minimum area of dimensional requirements of the zoning district in which the lot is located in effect at the time an application for a building permit is submitted may not be used for the construction of a dwelling if the lot was contiguous to and under the same ownership as one or more unimproved lots on January 1, 1987.

(c) A lot described in subsection (b) of this section may be used for the construction of a dwelling if:

(1) the lot is served by public water and sewer; or

(2) the lot is merged with the contiguous unimproved lot or lots in order to create a lot that complies with or comes as close as possible to complying with the minimum area

requirement of the zoning district in which the lot is located, provided that the owner executes and records a lot merger agreement as ·a condition precedent to receiving a building permit for the dwelling.

As the Board's majority opinion makes clear, both the Commission and the Anne Arundel County Office of Planning and Zoning support the variances at issue.[4] In *Marzullo v. Kahl,*

---

4. The Board's majority opinion includes the following discussion:

Ms. Kathy Shatt, a planner with the Office of Planning and Zoning, reviewed the Petitioner's requests and supports the variances. The site contains about 23 acres of land, and if the variances are approved, less than four acres would be disturbed. The development will have minimal disturbance to the environmentally sensitive area. The topography makes the site very difficult to develop. She has reviewed numerous plans for this property and this plan is the best way to develop the property.... The Petitioner has reduced the number of lots from 12 to seven. The Critical Area Commission does not oppose the variances. The Director of the Office of Planning and Zoning authored a letter dated November 17, 2004 to permit the Petitioner to submit a resubdivision plat for seven lots. The Office of Planning and Zoning will not sign off on the final plat until the Board has rendered a decision on this appeal. The Petitioner is requesting variances to permit disturbance within the expanded buffer, to disturb steep slopes, clear within the expanded buffer and a time extension. The variances are not to create a specific number of lots. If the Board feels a density variance is necessary, the Office of Planning and Zoning will support it. Under the RCA a property owner would receive only one dwelling unit per 20 acres. This property owner has the right to develop 12 lots. Road access could not be obtained without a variance.

Mr. Ren Serey, a representative of the Critical Area Commission, explained that the commission has examined this project for many years. For lots that are grandfathered, the Critical Area Program requires local governments to have procedures in place to minimize impacts. Anne Arundel County submitted proposed policies regarding antiquated lot procedures to the Critical Area Commission. Those policies were accepted. The Commission concluded that the proposed seven lots would minimize the impact to the Critical Area versus the 12 lots that can be developed under the grandfathered lot provisions of the County's Code. The requested variances for infrastructure and stormwater discharge and the platting of the second and third back-up septic systems within the required buffers are not opposed. However, it is the position of the Commission that it is unnecessary and inappropriate to use the process of density variances to permit the reduction of lots on this property. Mr. Serey noted other resubdivisions in the County that did not require variances and did not meet the density requirements. If an applicant is resubdivid-

366 Md. 158, 783 A.2d 169 (2001), this Court stated that "an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts." *Id.* at 172, 783 A.2d at 177. The Board was entitled to give considerable weight to the opinions expressed by representatives of the agencies responsible for administering the Critical Area programs.

From our review of the record, we agree with the Board that the variances at issue create seven "buildable" parcels that conform to the strict requirements imposed by the applicable statutes, ordinances, and COMAR regulations.

## III.

 There is no merit in the argument that the Board should have denied the request for variances submitted in reliance upon "nonconforming substandard lots in an old plat [of lots that were platted pursuant to a] plan [that had been] abandoned." As the Circuit Court stated in its Memorandum Opinion:

> [T]he doctrine of abandonment does not apply to recorded subdivision lots. There is no precedent in Maryland that validly recorded lots on a recorded subdivision plat are lost by the conveyance of lands not in accordance to the recorded plat. Application of the abandonment doctrine is inappropriate because use is statutorily defined and lots are not within the legal definition of use. The recording of lots is not a use because the recording of lots does not establish a purpose for which a site is employed or will be employed.... Finally, it is counterintuitive that a recorded plat should be deemed abandoned by subsequent lot owners' disregard for the platted lots rather than by some action or inaction by the county.

---

ing property for fewer lots and those lots will have fewer impacts to the Critical Area than would have been achieved otherwise, then no density variance is necessary.

We agree with that analysis.

Moreover, even if the doctrine of abandonment were applicable to recorded lots, this Court has stated that, "it is well-settled that 'the burden of proving abandonment rests on the one who asserts or relies on it.' " *Chevy Chase Land Co. v. United States,* 355 Md. 110, 161, 733 A.2d 1055, 1082 (1999) (quoting its *Md. & Pa. R.R. Co. v. Mercantile-Safe Deposit and Trust Co.,* 224 Md. 34, 40, 166 A.2d 247, 250 (1960)). As Respondent Anne Arundel County argues (in the words of its brief), "every relevant conveyance references the 1926 plat.... Construction of [a] cottage over lot lines shows an intent to merge the lots [but] a merger of lots does not mandate a conclusion that there was ever an intent to abandon the remaining lots." Because we agree with that argument, even if we were persuaded that evidence of subsequent conveyances and construction on the property was sufficient to *permit* the inference that the 1926 plan had been abandoned, we would hold that (1) Petitioners' evidence was insufficient to *require* that the Board draw such an inference, and (2) the Board was not clearly erroneous in rejecting "permissible inferences which might have been drawn from the evidence by another trier of the facts." *Hous. Opportunities Comm'n of Montgomery County v. Lacey,* 322 Md. 56, 61, 585 A.2d 219, 222 (1991).

## IV.

The Board's comprehensive opinion, from which we have quoted extensively, does not contain any clearly erroneous findings of fact. As the Board expressly recognized, "the burden on an applicant seeking a variance is very high." From our review of the record, we hold that there is no merit in the argument that the variances at issue were granted "simply" because the property could be "hypothetically" developed "in a manner that would have a greater environmental impact."

**JUDGMENT AFFIRMED; PETITIONERS TO PAY THE COSTS.**

Chief Judge BELL joins the judgment only.